**Joseph ENGLAND, Plaintiff, Appellee,**

v.

**REINAUER TRANSPORTATION COMPANIES, L.P., Defendant, Appellant.**

**Hale Intermodal Marine Company,
Defendant, Appellee.**

No. 99–1253.

United States Court of Appeals,
First Circuit.

Heard Sept. 14, 1999.

Decided Oct. 22, 1999.

Seth S. Holbrook with whom Stephanie J. Lyons was on brief, for appellant.

David J. Ansel for Joseph England.

Before LIPEZ, Circuit Judge, COFFIN and CAMPBELL, Senior Circuit Judges.

COFFIN, Senior Circuit Judge.

In June 1996, longshoreman Joseph England was seriously injured when a mooring line, binding a barge to the pier on which he was working, burst and struck him in the knee. Appellee England brought claims of negligence under the Longshore and Harbor Workers' Compensation Act, 33 U.S.C. §§ 901–950, against both the tug boat owner and the barge owner. Following the jury's verdict that all three parties were partially negligent, the tug owner filed post-judgment motions seeking a new trial on various grounds. The tug company appeals the denial of its motions. Finding no error, we affirm.

## I. *Background*

We relate the facts in the light most favorable to the jury's verdict consistent with support in the record. *See United States v. Rodriguez*, 162 F.3d 135, 140 (1st Cir.1998). On June 25, 1996, England, a longshoreman[1] employed by P & W Marine Service, was overseeing a gang of twelve longshoremen unloading and then loading cargo onto a barge, the Norfolk Trader. The tug John Reinauer, owned by Reinauer Transportation Company, towing the unmanned barge Norfolk Trader, owned by Hale Intermodal Marine Company, arrived at Moran Terminal at approximately 5:00 a.m. The tug crew secured the mooring lines on the barge; a team of line handlers received the lines thrown off the barge by the tug crew and placed them over bollards on the pier. The line handlers were employed by Hale for the limited purpose of assisting with the mooring and unmooring of the barge, but were not on site during cargo operations.

At approximately 8:00 a.m., just before the longshoremen were to begin unloading the barge, the tug crew inspected the mooring lines. The longshoremen ceased working for ten minutes at approximately 10:00 a.m., awaiting further loading instructions. The tug crew did not inspect the mooring lines during that break. Between 10:30 and 10:45, the tug's captain left the boat to make a phone call and testified that from the bow of the barge he viewed the entire row of mooring lines tying the barge to the pier. Shortly thereafter, the line attaching the stern of the barge to the pier burst, striking England, fracturing his kneecap, and rendering him disabled as a longshoreman. After a trial in October 1998, the jury found all three parties to be contributorily negligent and awarded England damages based on the following division of fault: Reinauer—58%; Hale—35%; England—7%. The jury was not, however, asked to specify what duty or duties it found each party to have breached.

During its cross-examination of England, Reinauer was prevented from introducing evidence that England received workers' compensation and medical benefits during his unemployment. Following the close of England's case-in-chief, Reinauer made a motion, which it renewed several times thereafter, for judgment as a matter of law or in the alternative a new trial, contending, *inter alia,* that the evidence was insufficient to establish that it owed England any duty and that the court had erred by excluding evidence of England's collateral source benefits. Reinauer also filed a post-judgment motion for disclosure of the terms of a settlement agreement that was reached by Hale and England after the close of all evidence but before the jury's verdict. On appeal, Reinauer contends that the court erred in denying its motions.[2]

## II. *Discussion*

We begin with a brief acknowledgment of the appropriate standards of review. We review the court's denial of Reinauer's motion for judgment as a matter of law *de novo,* but we examine the "evidence and the inferences to be extracted therefrom in the light most hospitable to the nonmovant, and may reverse the

---

**1.** Although the term "stevedore" traditionally refers to the entity or individual employing a group of longshoremen, in the Port of Boston it is given the unique meaning of a union representative supervising the gang of longshoremen and directing their cargo operations. For purposes of clarity, we refer to England as a "longshoreman."

**2.** Reinauer also filed a post-judgment motion for remittitur or in the alternative a new trial on the issue of damages, which was addressed by the court in the post-judgment order from which Reinauer appeals. Because the denial of this particular motion was not pursued on appeal, we need not address it. *See Pignons S.A. de Mecanique v. Polaroid Corp.,* 701 F.2d 1, 3 (1st Cir.1983) ("In preparing briefs and arguments, an appellee is entitled to rely on the content of an appellant's brief for the scope of the issues appealed. . . .").

denial of such a motion only if reasonable persons could not have reached the conclusion that the jury embraced." *Sanchez v. Puerto Rico Oil Co.*, 37 F.3d 712, 716 (1st Cir.1994). We review the court's denial of Reinauer's alternative request for a new trial for an abuse of discretion, recognizing that "the trial judge may set aside a jury's verdict only if he or she believes that the outcome is against the clear weight of the evidence such that upholding the verdict will result in a miscarriage of justice." *See Conway v. Electro Switch Corp.*, 825 F.2d 593, 598–99 (1st Cir.1987). Finally, regardless of whether Reinauer's motion for disclosure of the terms of the Hale–England post-trial settlement agreement is categorized as a discovery request (because it seeks disclosure to itself and to the court) or an evidentiary request (because it seeks disclosure to the jury), the court's disposition of the motion is committed to its sound discretion. *See Santiago v. Fenton*, 891 F.2d 373, 379 (1st Cir.1989) (stating that the trial court has broad discretion in determining the scope of discovery); *United States v. Cardales*, 168 F.3d 548, 557 (1st Cir.1999) (noting that evidentiary rulings are reviewed for an abuse of discretion).

### A. Reinauer's Duty to England

The Longshore and Harbor Workers' Compensation Act (LHWCA), 33 U.S.C. §§ 901–950, establishes workers' compensation benefits for longshoremen injured in work-related accidents. *See* 33 U.S.C. § 903(a). Regardless of fault, the longshoreman's employer must compensate the injured worker and his or her family with medical, disability, and death benefits. *See id.* §§ 904, 907–909. The LHWCA also allows a longshoreman to seek damages against a third-party vessel owner for injuries resulting from the vessel's negligence. *See id.* § 905(b). The statute does not define what actions constitute negligence, and thus individual questions must be resolved largely by the application of general tort principles. *See Howlett v. Birkdale Shipping Co.*, 512 U.S.

92, 97–98, 114 S.Ct. 2057, 129 L.Ed.2d 78 (1994).

The Supreme Court has, however, in *Scindia Steam Navigation Co. v. De Los Santos*, 451 U.S. 156, 101 S.Ct. 1614, 68 L.Ed.2d 1 (1981), provided guidance as to the main attributes of a shipowner's duty to longshoremen. In *Scindia Steam*, the Court outlined the application of § 905(b) to relations between a longshoreman and a vessel owner and placed the primary responsibility for avoiding accidents on the stevedore because he was "in the best possible position to avoid accidents during cargo operations." *See id.* at 164–72, 101 S.Ct. 1614. Generally, the vessel owner has the right to expect that the stevedore will perform his task safely and properly "without supervision of the ship." *See id.* at 170, 101 S.Ct. 1614. Nevertheless, the Court noted situations in which a shipowner's duty to exercise due care arises and delineated three aspects of the duty. *See id.* at 166–72, 101 S.Ct. 1614; *see also Howlett*, 512 U.S. at 98, 114 S.Ct. 2057 (characterizing the *Scindia Steam* decision as outlining three aspects of the shipowner's duty).

First, the shipowner has a "turnover duty" to warn the longshoremen of hazards from gear, equipment, tools, and workspace to be used in cargo operations "[t]hat are known to the ship or should be known to it in the exercise of reasonable care." *Scindia Steam*, 451 U.S. at 167, 101 S.Ct. 1614; *see also Howlett*, 512 U.S. at 98, 114 S.Ct. 2057. Second, the vessel is liable for a breach of its "active control duty" if it "actively involves itself in the cargo operations and negligently injures a longshoreman" or "if it fails to exercise due care to avoid exposing longshoremen to harm from hazards they may encounter in areas, or from equipment, under the active control of the vessel during the stevedoring operation." *Scindia Steam*, 451 U.S. at 167, 101 S.Ct. 1614; *see also Howlett*, 512 U.S. at 98, 114 S.Ct. 2057. Third, under the "duty to intervene," the ship-

owner has a duty only if "contract provision, positive law, or custom" dictates "by way of supervision or inspection [that the shipowner] exercise reasonable care to discover dangerous conditions that develop within the confines of the cargo operations that are assigned to the stevedore." *Scindia Steam*, 451 U.S. at 172, 101 S.Ct. 1614 (holding that when no contract, positive law, or custom was alleged, shipowner was not responsible for dangerous condition arising during cargo loading operations); *see also Howlett*, 512 U.S. at 98, 114 S.Ct. 2057.

Regarding the turnover duty, England concedes that a breach of this duty was not a possible basis for the jury's verdict. For ease of discussion, we turn now to the duty primarily in dispute, Reinauer's custom-generated duty to intervene, and we conclude with a brief discussion of Reinauer's active control duty. We note that Reinauer does not allege that the evidence was insufficient to support findings that the elements of negligence, other than the duty, were established.

Regarding Reinauer's duty to intervene, England presented evidence that a custom existed in the Port of Boston, encompassing the Charlestown Moran Terminal, that the tug crew not only initially moored the barge to the pier, possibly with the help of line handlers hired by the barge company, but also inspected and adjusted the mooring lines before cargo loading operations began as well as during breaks in the longshoremen's work. Mooring lines require periodic checking to ensure that they do not become exceedingly tight or slack due to the competing forces on them, such as alterations and shifts in the weight on the barge or movements of the tide. It was generally agreed that the need for safety on the pier and barge was at its peak while the longshoremen were working and that the adjustment of lines during active cargo loading could be unsafe.

▇ A "custom" can be defined generally as a "habitual practice or course of action that characteristically is repeated in like circumstances." *Black's Law Dictionary* 385 (6th ed.1990). Testimony at the trial regarding the alleged custom was provided by several witnesses. First, England testified that during his sixteen years as a longshoreman in Boston, he had not received training in the handling of mooring lines. England maintained that he had never been relied upon to attach, tighten, or slacken lines and that the responsibility had always been assigned exclusively to the tugboat crew and the barge agent. He commented that on the date of the accident he had not made any particular note of the lines and, indeed, he did not have the skill to observe whether a line was too tight or too slack. England stated that on occasion he had been informed by the crane operator that the lines were slack and the barge was pulling away from the pier, and that upon the relay of that information to the tug crew, the crew would tighten the lines.

Second, George Sargent, a ship supervisor employed by Massachusetts Port Authority to work at the Moran Terminal, testified that it was a custom and practice in the Port of Boston at the time of England's injury for "the tending of lines [to be done] by the ship, the tugboats, or, in certain cases, the [barge] agents" and that longshoremen did not have responsibility for tending lines. Third, Matthew Crimson, barge operations manager for Hale, agreed that it was consistent with his experience in the Port of Boston that the tug crew maintained mooring lines.

Fourth and most telling, Frederick Weber, captain of the tug, stated that on his "few dozen" trips into the Moran Terminal towing unmanned barges, the tug crew would secure the barge to the pier upon arrival, inspect the lines before the cargo operations began, and recheck the lines while the longshoremen were on break. Captain Weber testified that by "inspecting" the mooring lines, he meant that the tug crew "would walk over and check on them to make sure that they are not too tight, that the barge is up against

the dock, secure in place, and it's safe for people to come back and forth."

Although Captain Weber insisted that the tug crew was not "required" to inspect the lines, he conceded that they did so customarily as a matter of good seamanship. He also noted that he had been requested to adjust the lines in the past by a longshoreman or barge agent. Captain Weber stated that on the day of England's injury the tug crew checked the mooring lines at approximately 8:00 a.m., just before the longshoremen began work, and that, although they did not undertake a formal check during the longshoremen's 10:00 break, when he left the tug at approximately 10:30 to make a phone call in the terminal, he was able to view the lines along the barge and determine that "everything looked fine."

On appeal, Reinauer contends first that the custom alleged by England did not exist and second that even if a custom existed, custom alone is insufficient to establish a duty. We reject outright Reinauer's first argument that there was insufficient evidence to support a finding of custom. Although Reinauer argues that it had no duty to *continuously monitor* the condition of the mooring lines and make adjustments as cargo operations were occurring, an abundance of evidence lent itself to a finding that it was a custom in the Port of Boston for the tug crew to *inspect and adjust* the mooring lines before the cargo loading operations began and during breaks in the work. Not only was there ample evidence of such a custom, but the most conclusive testimony came from Reinauer's own Captain Weber.

In support of its second argument, Reinauer relies on *Florida Fuels, Inc. v. Citgo Petroleum Corp.*, 6 F.3d 330 (5th Cir.1993). In that case, a vessel crew member drowned after falling from a ladder providing access from the dock to the vessel and his family filed a maritime tort action against the vessel owner as well as the dock owner. *See id.* at 331. The Fifth Circuit held, without citation, that although

"custom itself does not create [a] duty," it might be relevant to the standard of care once a duty has been found to exist. *See id.* at 334. That case, however, was not brought under the LHWCA, because it did not involve a longshoreman's claim, and therefore the *Scindia Steam* outline of a shipowner's duties to longshoremen was not applicable.

The plain language of *Scindia Steam* clearly suggests that custom alone is sufficient to create a duty owed by a vessel to a longshoreman. Although in few cases has custom alone been alleged to establish a duty, other courts have noted that the *Scindia Steam* decision indicates that, if a custom did exist, it would establish a duty. *See, e.g., Keller v. United States,* 38 F.3d 16, 32 (1st Cir.1994) (stating that "post-'turnover' duty may arise if the vessel owner was obligated, by contract, statute or custom, to monitor stevedoring operations for the purpose of detecting and remedying unsafe conditions"); *Kirsch v. Plovidba,* 971 F.2d 1026, 1031 (3rd Cir.1992) (reciting *Scindia Steam* language); *Spence v. Mariehamns R/S,* 766 F.2d 1504, 1507–08 (11th Cir.1985) (considering whether evidence of custom sufficient); *Sarauw v. Oceanic Navigation Corp.,* 655 F.2d 526, 529 (3rd Cir.1981) (Adams, J., concurring) (suggesting that custom of "good seamanship" could create duty). Further, the limited scope of the custom established in this case—that the vessel crew has responsibility for inspecting and adjusting mooring lines before cargo operations and during breaks in the loading only in the Port of Boston—does not in any way contravene the overarching principle enunciated in *Scindia Steam* that vessel owners are not responsible for generally overseeing cargo operations.

Moreover, regardless of whether Reinauer owed England a custom-generated duty to intervene, the jury would have been warranted in finding that Reinauer owed England an active control duty. The active control duty "recognizes that although a vessel owner no longer retains

the primary responsibility for safety in a work area turned over to an independent contractor, no such cession results as relates to areas or equipment over which the vessel's crew retains operational control." *Manuel v. Cameron Offshore Boats,* 103 F.3d 31, 34 (5th Cir.1997).

▮ Reinauer argues that it did not have active control over the *area* where the mooring line parted on the day of the accident and completely ignores that strand of the active control duty that extends to *equipment* over which the vessel retains control. *See Scindia Steam,* 451 U.S. at 167, 101 S.Ct. 1614 (stating that the vessel owner may be liable "if it fails to exercise due care to avoid exposing longshoremen to harm from hazards they may encounter in areas, or from equipment, under the active control of the vessel"); *see also Torres v. Johnson Lines,* 932 F.2d 748, 750 (9th Cir.1991) (considering whether vessel had exerted active control over loading ramps).[3] England contends that the mooring lines were within the exclusive control of the tug crew and barge agent as evidenced by the tug crew's morning inspection of the lines on the day of the accident, Captain Weber's mid-morning check of the lines, the vessel crew's admitted practice of reviewing the lines at certain intervals, and the longshoremen's lack of knowledge about the tending of mooring lines. The evidence presented by England was ample to allow the jury to find that Reinauer retained operational control over the mooring lines and thus had an active control duty to inspect and adjust them.[4]

### B. *Exclusion of Evidence of England's Collateral Source Benefits*

▮ Reinauer also argues that the court's exclusion of evidence that England received collateral source income and medical benefits under the LHWCA was an error that requires it be granted a new trial. Reinauer contends that the evidence should have been admitted because it was relevant to England's credibility as well as his motive for not returning to work. Reinauer alleges that England opened the door to this evidence by testifying that he returned to work for a trial period after the accident "to be productive and make some money to pay some bills" and that a non-union job would provide insufficient income.

▮ The substantive aspect of the collateral source rule in Massachusetts provides that "compensation received from a third party unrelated to a tortfeasor-defendant (the collateral source) will not diminish an injured party's recovery from that tortfeasor." *Fitzgerald v. Expressway Sewerage Const., Inc.,* 177 F.3d 71, 73 (1st Cir.1999) (citing *Jones v. Wayland,* 374 Mass. 249, 262, 373 N.E.2d 199, 207 (1978); *Goldstein v. Gontarz,* 364 Mass. 800, 809, 309 N.E.2d 196, 203 (1974)). When a case is being heard in federal court, the evidentiary, as opposed to the substantive, aspects of the collateral source rule are governed by the Federal Rules of Evidence, particularly Rules 401, 402, and 403. *See Fitzgerald,* 177 F.3d at 74. Under the evidentiary strand of the collateral source rule, "[e]vidence of collateral benefits offered to show that an employee has already received compensation for his injuries is generally inadmissible." *Torres,* 932 F.2d at 752. When such evidence is relevant to some other contested issue, however, it may be admitted if it is

**3.** Although in *Howlett* the Supreme Court referenced the active control duty as it related to "areas" under the vessel owner's control, the active control duty was not at issue in that case. *See Howlett,* 512 U.S. at 98, 114 S.Ct. 2057.

**4.** Reinauer also assigns error to the court's instructions regarding the active control duty. After the court had instructed the jury, Reinauer, at side bar, asked the court to further instruct that "acts of control are defined as control that excludes longshoremen concerning that operation." Because Reinauer cites no authority, nor do we find any, dictating that the control exercised by the vessel must be *exclusive* in order to create an active control duty, we hold that the charge was adequate.

not unfairly prejudicial; the risk of unfair prejudice from the admission of this type of evidence must be weighed carefully because "a jury, informed, say, that a plaintiff has recourse to first party insurance proceeds, may be unduly inclined to return either a defendant's verdict or an artificially low damage award." *Fitzgerald,* 177 F.3d at 75.

Reinauer relies on *Fitzgerald,* in which the court upheld the admission of collateral source benefits evidence when the victim's mother testified that the medical bills resulting from the victim's accident had financially strained the family. *See id.* at 75–76. Reinauer also references *Corsetti v. Stone Co.,* 396 Mass. 1, 483 N.E.2d 793 (Mass.1985), in which the Massachusetts Supreme Judicial Court upheld the introduction of evidence of collateral source benefits, when the victim's motivation was a genuine issue at trial, to contradict the victim's extensive testimony of the "lack of money" that he experienced as a result of his injuries. *See id.* at 803–04.

England's testimony in this case, however, was not sufficient to imply that he was suffering such financial difficulties as to negate impliedly the receipt of any additional benefits due to the accident and thus did not open the door for the introduction of his collateral source benefits. Moreover, the court noted, when preventing Reinauer from inquiring into England's collateral source benefits on cross-examination, that the jury was likely aware that England was receiving workers' compensation benefits. Further, England testified on direct examination that if he took a non-union job he would be expelled from the union and would thus lose his health benefits, implying that he continued to receive medical benefits while unemployed. Thus, the district court could reasonably have concluded that the evidence of England's collateral source benefits, even if relevant to his credibility or his motive for not returning to work, would have been cumulative as well as unfairly prejudicial

to England and did not abuse its discretion in excluding it.

## C. *Disclosure of the Hale–England Settlement Agreement*

Finally, Reinauer contends that the court's denial of its post-judgment motion for disclosure of the terms of the settlement agreement between Hale and England was error because the agreement was a "Mary Carter" agreement and thus unfairly prejudicial to Reinauer. A "Mary Carter" agreement, occurring in multi-party litigation, derives its name from *Booth v. Mary Carter Paint Co.,* 202 So.2d 8 (Fla.Dist.Ct.App.1967), and, although it has been characterized many ways, can be summarized as an agreement in which:

(1) the liability of the settling defendant is limited and the plaintiff is guaranteed a minimum recovery; (2) the settling defendant remains a party to the pending action without disclosing the full agreement to the nonsettling defendants and/or the judge and jury; and (3) if judgment against the nonsettling defendant is for more than the amount of settlement, any money collected will first offset the settlement so that the settling defendant may ultimately pay nothing.

*Banovz v. Rantanen,* 271 Ill.App.3d 910, 208 Ill.Dec. 617, 649 N.E.2d 977, 980 (Ill. App.Ct.1995). "Mary Carter" agreements have been widely criticized as unfair and against public policy. *See, e.g.,* John E. Benedict, Note, "It's a Mistake to Tolerate the Mary Carter Agreement," 87 Colum.L.Rev. 338 (1987) (contending that "Mary Carter" agreements prejudice nonsettling defendants, destroy equitable contribution of defendants, and contradict legal ethics).

The Hale–England agreement fails in several essential respects to be a "Mary Carter" agreement. First, it was not kept secret; all parties as well as the court were apprised at various points in the trial of the ongoing negotiations between Hale and England. For example,

on October 5, the second day of trial, England's counsel informed the court and all parties, in chambers, that England had reached a tentative settlement with Hale, but that its finalization was dependent on the court's ruling on Hale's motion in limine to exclude from evidence a contract between Hale and Reinauer. Second, because it was endorsed on October 13, after the case had been submitted to the jury, the settlement cannot be guilty of altering the parties' behavior during trial. Third, England represents that the agreement established a settled sum, not contingent on the jury's verdict. For all of these reasons, the agreement did not subversively motivate Hale and England to join in undermining Reinauer's defense; the adversarial nature of the relationship between Hale and Reinauer was already established by their roles as co-defendants and their cross-claims for indemnification and contribution.[5]

Given that the Hale–England agreement does not fall into the "Mary Carter" category, the issue reveals itself to be the simpler question of whether the court abused its considerable discretion by refusing to force Hale and England to disclose the terms of its post-trial agreement to Reinauer, the court, and the jury. As we have already explained, the timing of the settlement was such that it did not alter the relationships between the parties and thus disclosure of its terms to Reinauer or the court was unnecessary. Moreover, it is doubtful that the court would have informed the jurors of the terms of the settlement since they had already entered deliberations requiring them to specify the degree of fault of each party. For these reasons, we hold that the court did not err by denying Reinauer's disclosure request.

5. In addition to insisting that the settlement agreement does not meet the definition of a "Mary Carter" agreement, England represents on appeal that the settlement has not

Because we find no error in the court's post-trial rulings, we affirm its judgment.

*Affirmed.*

been implemented due to the failure of the parties to perform various contingency requirements, such as the execution of a release by England.