James CAPERS, Plaintiff,

v.

COLUMBIA COASTAL TRANSPORT, INC., Defendant.

No. 2:02–0975–18.

United States District Court,
D. South Carolina,
Charleston Division.

May 16, 2003.

Edward Paul Gibson, Allison Ann Stover, Riesen Law Offices, N Charleston, SC, for James Capers, plaintiff.

Gordon D Schreck, Buist Moore Smythe and McGee, Charleston, SC, Gino A Zonghetti, Kenny Stearns and Zonghetti, New York, NY, for Columbia Coastal Transport Inc, defendant.

## ORDER

NORTON, District Judge.

This matter is before the court on defendant's motion for summary judgment pursuant to Rule 56 of the Federal Rules of Civil Procedure.

## I. Background [1]

Plaintiff James Capers ("Capers"), a longshoreman employed by Cooper/T. Smith Stevedoring ("Cooper"), was injured when he attempted to disembark onto a dock from the "Columbia New York," an unmanned barge (the "barge") owned by defendant Columbia Coastal Transport, Inc. ("Columbia Coastal"). On July 16, 2001, a tugboat owned by Moran Towing Company ("Moran") transported the barge to the Wando Terminal in the port of Charleston, South Carolina pursuant to a towage contract between Columbia Coastal and Moran. When the barge arrived at the dock, union line handlers employed by Columbia Coastal secured the barge to the dock with mooring lines.[2] Then, at around 8:00 a.m., Columbia Coastal turned the barge over to Cooper for its stevedoring services.

Capers was the flagman in a gang often longshoremen employed by Cooper to load and unload containers from the barge. Larry Neesmith was the foreman of this gang of longshoremen. A crane operator, who was employed by the South Carolina Ports Authority but was under the control and direction of Cooper, also participated in the loading and unloading of the containers. Columbia Coastal had one representative, Terminal Assistant Dan Tolson, present on the dock during the stevedoring operations.

The longshoremen, including Capers, boarded the barge either by stepping directly onto it from the dock or by stepping over from flatbed trucks on the dock that had been pulled up next to the barge. At the time the longshoremen boarded the barge, it was approximately two feet higher than the dock. Capers worked on the barge from 8:00 a.m. to about 12:30 p.m., at which time he attempted to disembark. By this time, the deck of the barge was approximately five feet higher than the dock because weight been unloaded during the operations and the tide conditions had changed. The mooring lines had loosened and the barge was now approximately 2.5 feet from the dock. Facing the bow of the

---

1. The following facts are based on the evidence before the court, drawing all reasonable factual inferences in favor of plaintiff, the non-moving party.

2. The union line handlers were responsible for tying the barge to the dock when it arrived and untying it at the end of the cargo operations. They were not present during the cargo operations.

boat, with the left side of his body facing the boat and the right side facing the dock, Capers placed his left foot in a "pigeon hole" on the starboard hull of the barge and attempted to jump sideways onto the dock. When he landed on the dock, he lost his footing, stumbled over some railroad tracks and fell, fracturing his left elbow.

Capers missed three months of work as a result of his injury. During this time, he received worker's compensation payments from Cooper, his employer, under the Longshore and Harbor Workers' Compensation Act ("LHWCA"), 33 U.S.C.A. §§ 901 to 950 (West 2003). In addition, he filed this third-party liability action against Columbia Coastal pursuant to LHWCA, 33 U.S.C. § 905(b).

## II. Summary Judgment Standard

Summary judgment shall be granted when the "pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). "At the summary judgment stage the judge's function is not himself to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 249, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). There is no requirement that the trial judge make findings of fact. *Id.* at 250. Rather, the threshold inquiry is whether "there are any genuine factual issues that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party." *Id.* In other words, "to grant summary judgment the court must determine that no reasonable jury could find for the nonmoving party on the evi-

dence before it." *Perini Corp. v. Perini Const., Inc.,* 915 F.2d 121, 124 (4th Cir. 1990). An issue of fact concerns material facts only if establishment of the fact might affect the outcome of the lawsuit under governing substantive law. *Anderson,* 477 U.S. at 248, 106 S.Ct. 2505. All facts and reasonable inferences therefrom are viewed in the light most favorable to the nonmoving party. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 587–88, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986).

"[A] party seeking summary judgment always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett,* 477 U.S. 317, 324, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986) (quoting Fed. R.Civ.P. 56(c)). Once this burden has been met, the nonmoving party must "go beyond the pleadings and by her own affidavits, or by the 'depositions, answers to interrogatories, and admissions on file,' designate 'specific facts showing that there is a genuine issue for trial.'" *Id.* (quoting Fed.R.Civ.P. 56(e)); *see also Pleasurecraft Marine Engine Co. v. Thermo Power Corp.,* 272 F.3d 654, 658 (4th Cir.2001).

## III. Law/Analysis

The LHWCA "establishes a comprehensive federal workers' compensation program that provides longshoremen and their families with medical, disability, and survivor benefits for work-related injuries and death." *Howlett v. Birkdale Shipping Co., S.A.,* 512 U.S. 92, 96, 114 S.Ct. 2057, 129 L.Ed.2d 78 (1994) (internal citations omitted). "The injured longshoreman's employer—in most instances, an indepen-

dent stevedore—must pay the statutory benefits regardless of fault, but is shielded from any further liability to the longshoreman." *Id.* Under § 905(b), "[t]he longshoreman also may seek damages in a third-party negligence action against the owner of the vessel on which he was injured, and may do so without forgoing statutory compensation if he follows certain procedures." *Id.* The design of the 1972 amendments to the LHWCA "was to shift more of the responsibility for compensating injured longshoremen to the party best able to prevent injuries: the stevedore-employer." *Id.* at 97, 114 S.Ct. 2057 (citing *In Scindia Steam Nav. Co. v. De Los Santos,* 451 U.S. 156, 171, 101 S.Ct. 1614, 68 L.Ed.2d 1 (1981)). However, the Supreme Court has explained that shipowners may owe three potential duties to longshoremen:

The first, which courts have come to call the "turnover duty," relates to the condition of the ship upon the commencement of stevedoring operations. The second duty, applicable once stevedoring operations have begun, provides that a shipowner must exercise reasonable care to prevent injuries to longshoremen in areas that remain under the "active control of the vessel." The third duty, called the "duty to intervene," concerns the vessel's obligations with regard to cargo operations in areas under the principal control of the independent stevedore.

*Howlett v. Birkdale Shipping Co., S.A.,* 512 U.S. 92, 98, 114 S.Ct. 2057, 129 L.Ed.2d 78 (1994) (citing *Scindia,* 451 U.S. at 167–78, 101 S.Ct. 1614).

Columbia Coastal moves for summary judgment on the grounds that (1) it did not breach the "turnover duty"; (2) it did not owe any duty to plaintiff under the "active control" theory; and (3) it did not have any "duty to intervene." Capers does not argue that Columbia Coastal breached its "turnover duty." Rather, Capers summarizes his argument as follows:

Plaintiff, James Capers, argues that he was injured as a result of Defendant's failure to uphold its duty to keep the barge taught [sic] to the pier—a duty that is never turned over to the stevedore and, thus, remained in its active control—and/or Defendant's failure to intervene in the stevedoring operations once the dangerous condition arose based on the customary practices in the Port of Charleston.

(Pl's. Opp. Mem. at 8.)

## A. "Active Control" Duty

■ The first issue is whether Columbia Coastal had a duty to keep the barge close to the pier because this was an area that remained under its "active control." The Supreme Court in *Scindia* further explained this duty as follows:

[T]he vessel may be liable of it actively involves itself in the cargo operations and negligently injures a longshoreman or if it fails to exercise due care to avoid exposing longshoremen to harm from hazard they may encounter in areas, or from equipment, under the active control of the vessel during the stevedoring operation.

*Scindia,* 451 U.S. at 167, 101 S.Ct. 1614.

Capers argues that the duty to keep the barge snug to the pier remained with Tolson, Columbia Coastal's representative, and was never turned over to Cooper during the cargo operations. (Opp. Mem. at 8.) Capers cites the deposition testimony of Gregory Chambers of Cooper and Frank Schachte of Columbia Coastal in support of this proposition. However, both Chambers and Schachte testified that the process for keeping the barge close to the dock during cargo operations was as follows: the crane operator would notify the

stevedore that the lines needed to be tightened because it was interfering with his task of moving the containers; the stevedore would relay this message to the barge representative; the barge representative would tell the tug boat operator to move the barge closer; and finally, the tug boat owner would send a crew out to tighten the lines. When asked whose responsibility it was to move the barge closer, Schachte testified as follows:

> Well, the stevedore, who is monitoring or is in charge of the loading or discharging operation, is in contact with the crane operator. The crane operator will tell us immediately if the barge is not snug up against the dock because he can't perform his function. The stevedore then would contact our representative on the pier, who would talk to the tugboat and tell them to snug it up.

(Schachte Depo. at 29.) Chambers testified:

> Q: So is the crew of the tug responsible for doing that, making sure that the barge is held tightly?
>
> A: Yeah. The tug holds the barge tight to the pier. That's right.
>
> Q: Is the tug under the control of you the Stevedore, or under the control of the owners of the barge?
>
> .    .    .    .    .
>
> A: It would be under the control of the operator.
>
> Q: Of the barge?
>
> A: Right.
>
> Q: You don't hire a tug?
>
> A: No.
>
> Q: And you don't give orders to a tug?
>
> A: Yes, we do, but we would instruct them that—yes we do give them orders.

> Q: Are those orders passed through the superintendent or representative of the operator of the barge?
>
> A: *The chain of command would be thus: It would be if the barge were adrift and it impeded the operation, we would go to a representative of the barge company and ask them to inform the tug to please hold her tight to the side.*

(Chamber Depo. at 17–18 (emphasis added).) Chambers further testified:

> Q: And isn't it this procedure that the stevedore will make the determination as to whether the barge need to be moved closer at a specific time by the tug and give that direction to the representative of the barge, give that communication to the tug boat?
>
> A: Yeah. It usually is that the crane operator is asking that we bring—that we come along tighter. In turn, the [stevedore] superintendent that's working the dock would have informed the [barge] representative and say, please tell the tug to bring her closer.
>
> Q: The crane operator is under the direction of the stevedore?
>
> A: Yes.
>
> Q: So -
>
> A: He's not our employee, but he's under our direction.
>
> Q: He's an employee of the port authority?
>
> A: That's right.
>
> Q: So the Stevedore will make the determination as to whether the barge has to be moved in closer to the dock, and the crane operator may communicate that to the Stevedore, who communicates that ultimately to the tug boat?

A: Yeah. Crane operator, Stevedore, Stevedore representative,[3] tug boat.

Q: That's the line of communication?

A: That's usually the line of communication.

Q: And that includes circumstances where moving the barge closer is necessary for safety, whether it be for ingress or egress; is that correct?

A: That's right.

(Chamber Depo. at 22–24.) Therefore, the evidence shows that the material facts are not in dispute. The question is whether as a matter of law, these facts show that the vessel had "active control" over keeping the barge close to the dock.

As an initial matter, it is well-settled that the mere presence of the ship's crew members during the cargo operations is not sufficient to implicate the "active control" duty. *Bonds v. Mortensen and Lange*, 717 F.2d 123, 128 n. 4 (4th Cir. 1983); *Harris v. Pacific–Gulf Marine, Inc.*, 967 F.Supp. 158, 164 (E.D.Va.1997). However, Tolson was more than merely present during the cargo operations; he was responsible for relaying any request by the stevedore to tighten the lines to the tug boat. Thus, *Bonds* does not establish that no "active control" duty existed in this case.

Plaintiff relies on *England v. Reinauer Transp. Companies, L.P.*, 194 F.3d 265 (1st Cir.1999) as a factually analogous case. In that case, a longshoreman was injured when one of the mooring lines burst and struck him in the knee. *Id.* at 269. The First Circuit affirmed a jury verdict finding the following comparative negligence:

tugboat owner—58%; barge owner—35%; and plaintiff longshoreman—7%. *Id.* The relevant issue on appeal was whether the tug boat owner owed a duty to the plaintiff because it was in "active control" of the mooring lines. *Id.* at 272–73. "[The plaintiff] contend[ed] that the mooring lines were within the exclusive control of the tug crew and barge agent as evidenced by the tug crew's morning inspection of the lines on the day of the accident, [the tug boat captain's] mid-morning check of the lines, the vessel crew's admitted practice of reviewing the lines at certain intervals, and the longshoremen's lack of knowledge about the tending of mooring lines." *Id.* at 273. The court held that this evidence "was ample to allow the jury to find that [the tug boat] retained operational control over the mooring lines and thus had an active control duty to inspect and adjust them." *Id. England*, however, is distinguishable from this case for a couple of reasons. First, tug boat's rather than the vessel's control was the issue on appeal. Second, and more importantly, the court in *England* relied on specific evidence that it was customary in the port of Boston for the tug boat and vessel crew to be responsible for tending the mooring lines during the cargo operations, and they had routinely inspected them on the day of the accident. *Id.* at 271–73. Here, Tolson's role was merely a conduit between the stevedore and the tugboat. There is no evidence that Tolson engaged in any "practice of reviewing the lines at certain intervals" during the cargo operations. *Id.* at 273. Instead, the testimony before the court shows that Tolson relied on the stevedore, usually at the request of the crane

---

**3.** Based on his earlier testimony, Chambers probably meant to refer to the barge representative rather than the "stevedore representative." Regardless, the material fact is that the process of moving the barge closer to the dock was initiated either by the crane operator, who was under the control of the stevedore, or by the stevedore.

operator, to inform him that the lines need to be tightened. Thus, *England* is not persuasive authority for finding that Columbia Coastal had a duty under the "active control" theory.

Rather, the evidence in this case, drawing all reasonable inferences in the light most favorable to Capers, shows that Columbia Coastal did not have "active control" over keeping the barge close to the dock during the cargo operations. Although Columbia Coastal and the tug boat operator retained the exclusive authority to physically move the barge closer to the dock, it is uncontroverted that Cooper made the initial judgment as to whether the barge needed to be moved. Tolson did not regularly inspect the lines to make sure they were tight and that the barge was close enough to the dock. Instead, the crane operator and Cooper were responsible for monitoring the position of the barge and initiating the process of moving it closer to the dock. Therefore, Columbia Coastal may not be held liable for failing to exercise due care to avoid exposing Capers to the allegedly dangerous gap between the barge and the dock because this area was not under its "active control" during the stevedoring operation.

## B. Duty To Intervene

In the alternative, Capers argues that even if Columbia Coastal were not in "active control" over keeping the barge close to the dock, it had a "duty to intervene" in the stevedoring operations once the dangerous condition arose based on the customary practices in the Port of Charleston. In *Scindia*, the Supreme Court explained:

> [A]bsent contract provision, positive law, or custom to the contrary—none of which has been cited to us in this case—

the shipowner has no general duty by way of supervision or inspection to exercise reasonable care to discover dangerous conditions that develop within the confines of the cargo operations that are assigned to the stevedore.

451 U.S. at 172, 101 S.Ct. 1614. However, if the barge owner has knowledge of a dangerous conditions in areas under the stevedore's control, the barge owner may have a duty to intervene "when the barge owner has knowledge that the stevedore's judgment in carrying out his tasks is 'obviously improvident.'" *Bonds*, 717 F.2d at 127 (4th Cir.1983) (citing *Scindia* at 451 U.S. at 175–76, 101 S.Ct. 1614).

Capers argues that the customary practices in the port of Charleston created a duty for Columbia Coastal to supervise and inspect the mooring lines and the position of the barge to the dock. Again, Capers relies on *England*, which held that the tug boat owner owed a duty to the plaintiff longshoreman because a custom existed in the port of Boston "that the tug crew not only initially moored the barge to the pier, possibly with the help of line handlers hired by the barge company, but also inspected and adjusted the mooring lines before cargo loading operations began as well as during breaks in the longshoremen's work." 194 F.3d at 271. As explained above, *England* is distinguishable because Capers has not presented any evidence in this case that it was customary for Columbia Coastal to supervise and inspect the mooring lines to make sure the boat remains close to the deck. Rather, the testimony is that Columbia Coastal relied on Cooper to inform it when the lines needed to be adjusted or the boat need to be moved closer. Capers's proffered expert, Commander David E. Cole, testified as follows:

It is my opinion that the owner of the COLUMBIA NEW YORK did not live up to the proper standard of care in that it would have been within the ability of the owner's representative on scene to provide for safe egress from the barge for the longshoreman still aboard once other means had been removed. This would include having the towing vessel move the barge back in to the dock, or requiring the continued availability of the man-basket. The distance from the dock to the edge of the barge made even the use of the pigeon-holes unsafe.

(Opp. Mem. Ex. E at 3.) Although this testimony posits that Tolson had the "ability" to intervene and alleviate the dangerous condition, it does not state that it was customary for the barge representative to supervise and inspect the safety conditions of the longshoremen's means of ingress and egress from the barge. Thus, Capers has failed to show evidence of any custom that created a duty for Columbia Coastal to supervise and inspect the mooring lines and the position of the barge to the dock.

### III. Conclusion

It is therefore,

**ORDERED**, for the reasons stated above, that defendant's Motion For Summary Judgment be **GRANTED**.

**AND IT IS SO ORDERED.**