Anthony PAPARO, Plaintiff, Appellant,

v.

M/V ETERNITY; Denholm Ship Management, Ltd., Defendants, Appellees.

No. 05–1767.

United States Court of Appeals, First Circuit.

Heard Nov. 8, 2005.

Decided Jan. 5, 2006.

Brian S. McCormick for appellant.

James B. Re for appellees. ·

Before BOUDIN, Chief Judge, STAHL, Senior Circuit Judge, and LYNCH, Circuit Judge.

STAHL, Senior Circuit Judge.

Anthony Paparo was injured in a fall while working as a line handler securing a large tanker to a dock in Quincy, Massachusetts. He brought suit under the Longshore and Harbor Workers' Compensation Act (LHWCA), 33 U.S.C. § 901 et seq., against the owner of the vessel, Denholm Ship Management, Ltd. ("Denholm").[1] The complaint alleged that the crew of the vessel negligently caused Paparo's injury. At the close of discovery, Denholm moved for summary judgment, and the District Court for the District of Massachusetts granted the motion, finding that Paparo had failed to produce sufficient evidence to support his theory of the

---

1. The vessel in question, the M/V Eternity, is named as an *in rem* defendant in the complaint, although Denholm contends that the vessel was never served with process and thus was never properly a party to the action.

accident. Paparo appealed, and we now reverse.

## I. Background

On September 22, 2000, Paparo was among six line handlers employed to assist with the docking of the ocean-going vessel Eternity at a dock in Quincy. The Eternity, a tanker 600 to 700 feet in length, approached the dock escorted by two tugboats. As the ship pulled alongside the dock, a crew member on board threw a "heaving line"[2] from the ship's deck to the dock where Paparo was waiting with a fellow handler, Vincent Leo. The heaving line carried the "eyes"[3] of two mooring lines, larger ropes four to five inches in diameter. Using the heaving line, Paparo and Leo brought the ends of the mooring lines up onto a cluster of pilings next to the dock. Their ultimate aim was to secure the Eternity by its mooring lines to a bollard[4] on the dock.

Leo then stood on the cluster of pilings and Paparo took up a position on the dock itself. It was Paparo's job to take one of the mooring lines to a bollard about fifteen or twenty feet away; Leo was to pull the mooring line out of the water, providing sufficient slack to allow Paparo to progress toward the bollard. After grasping the eyes of the mooring lines, Paparo untied the heaving line and let it loose. He placed his right arm through one of the eyes and began moving toward the bollard, with his back to the Eternity, while Leo hauled the line from the water and fed it

to him. As Paparo neared the bollard, he felt a "heaving" on the line. Paparo testified that he was pulled by the line and jerked about six feet backwards. As the line was dragged out of his grip, he fell and was injured. After his fall, Paparo got to his feet and shouted at a crew member on the deck of the ship; the man, who allegedly did not speak English, made a gesture that Paparo interpreted as an apology.

The dispute between the parties pertains to the cause of the accident. Paparo contends that the accident occurred when someone on board the Eternity prematurely used the ship's winch to haul the line back in, thus jerking the line out of Paparo's grip, causing him to fall. Both Paparo and Leo testified that, immediately after the fall, they saw the line being drawn back up onto the vessel.[5] Paparo believes this to be evidence that a crew member began operating the winch to retract the line before the line was firmly attached to the bollard, while Paparo was still holding onto it, and that such an action was negligent.

Denholm, the ship's owner, contests Paparo's account of the events on the dock. It contends instead that Leo was accumulating slack on the pilings, and that the Eternity's winch was not capable of running fast enough to first take up that slack and then yank the line from Paparo's grip hard enough to knock him down, without Leo and Paparo first noticing the line withdrawing and letting go of it. Denholm

---

2. A heaving line is a light line, approximately a half inch in diameter, that is weighted with a "monkey's fist" so that the line will carry when thrown. It is thrown ashore from a vessel and used to haul in heavier lines, which are attached to the other end of the heaving line.

3. Eyes are large spliced loops at the end of the lines.

4. A bollard is a metal or wooden post on a wharf to which mooring lines are fastened.

5. Paparo testified that he saw the line "going up," and Leo testified that he saw the line "returning to the vessel."

suggests that the only possible explanation for the incident is that the excess slack fell off the pilings into the water, jerking the line from Paparo's grip through no fault of the ship or its crew. Paparo, however, denies that there was any excess slack that could have caused the accident in this manner, and Leo testified that he was not accumulating any more slack than necessary to feed the line to Paparo.

In support of its motion for summary judgment, Denholm presented the testimony of an expert witness, Richard Miner, a marine surveyor. Miner testified that, even had a crew member been operating the ship's winch, the winch would have pulled the line back too slowly and gradually to retract all the slack and create the yanking motion that Paparo felt. He assumed that the winch operated to haul in line at a speed of 200 feet per minute, although he conceded that he did not know exactly what type of winch the Eternity had on board and that the winch might have operated faster than that. He also assumed that there were seventy to eighty feet of line out from the ship to where Paparo was standing, although the parties disputed the distance between the ship and the dock as well as the overall amount of line out. Using these assumed figures for the length of the rope and the speed of the winch, Miner concluded that Paparo's theory of the accident was simply not plausible.

When ruling on Denholm's motion for summary judgment, the district court found two pieces of Leo's testimony damaging to Paparo's claim: that Leo did not feel any movement on the line immediately before Paparo fell, and that he saw a portion of slackened line in the water immediately after the accident. As to the first piece of testimony, the court reasoned that because Leo had been pulling on the line in order to feed it to Paparo, he would have had his hands on the line at almost all times and would have felt any tug or jerk caused by premature retraction of the line. As to the second piece of testimony, the court evidently felt that if Leo saw a portion of line in the water after the accident, as he testified, that line must have still been slack after the accident, meaning that the winch could not have taken up all the slack and created a taut line between the ship and Paparo.

In the end, the district court looked at the plaintiff's evidence in light of Miner's expert testimony that a winch operates in a gradual and controlled manner and concluded that it was impossible for the accident to have occurred as Paparo theorized. The court thus granted Denholm's motion for summary judgment.

## II. Discussion

We review the district court's grant of summary judgment *de novo*, applying the same standard as did the court below. *Leon v. Municipality of San Juan*, 320 F.3d 69, 71 (1st Cir.2003). Summary judgment is appropriate when, drawing all reasonable inferences in favor of the nonmoving party (here, Paparo), "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." *Id.* (quoting Fed.R.Civ.P. 56(c)). Employees covered by the LHWCA, as Paparo is, are statutorily barred from suing their employers for employment-related injuries. *See* 33 U.S.C. § 905(a). However, an employee may bring a third-party suit against the owner of a vessel if he has a claim that his injury was caused by the negligence of the owner or of the ship's crew. *See* 33 U.S.C. § 905(b); *England v. Reinauer Transp. Cos.*, 194 F.3d 265, 270 (1st Cir. 1999). Under the LHWCA, a vessel is liable for negligence "if it fails to exercise

due care to avoid exposing longshoremen to harm from hazards they may encounter in areas, or from equipment, under the active control of the vessel during the stevedoring operation." *Id.* (quoting *Scindia Steam Navigation Co. v. De Los Santos,* 451 U.S. 156, 167, 101 S.Ct. 1614, 68 L.Ed.2d 1 (1981)).

Denholm argued, and the district court evidently agreed, that Paparo had simply not presented sufficient material evidence to support his theory that the accident was caused by negligence on the part of the vessel's crew. We think, however, that the district court too readily adopted Denholm's theory of the case without properly drawing reasonable inferences from the evidence presented thus far in favor of Paparo, the non-moving party. When those inferences are drawn, this case presents triable issues of material fact about the cause of the accident.

First, the court seemed to treat as undisputed fact the expert testimony of Miner, the marine surveyor, that the winch operated too slowly and gradually to take up all the slack in the line and yank or jerk the line away from Paparo. But, as Paparo points out, Miner's opinion itself rests on facts that are in dispute: namely, the operating speed of the Eternity's winch and the number of feet of slack that were out on the line between the ship and Paparo. These disputed facts are essential to any calculation of how long it would have taken to retract enough line to pull Paparo over.

Second, even if Miner's testimony is entirely credited, a reasonable jury could still find for Paparo if it believed Leo's testimony that he felt no jerk or tug in the line because his hands were off the line at the moment of the accident. This is because, if Leo was not touching the line while the winch was pulling it in, the winch could have hauled in any excess slack and then pulled Paparo over, without Leo becoming alerted to the problem.

Third, it does not appear to be the case, as Denholm contends and the district court implicitly agreed, that the only possible cause for the accident was that accumulated slack fell from the pilings into the water. For one thing, Leo denies having accumulated excess slack on the pilings. Even if there were several feet of slack piled on the dock, however, it is possible that a crew member's premature activation of the winch exerted force on the coiled line, which then fell into the water, causing Paparo's fall.

Finally, the district court assigns great importance to Leo's testimony that he saw some line slack in the water immediately following the incident.[6] But Paparo testified that as he fell, the line was pulled from his grip and slid into the water. A reasonable jury could conclude that what Leo saw in the water was the loose end of the line that Paparo had been holding.

In short, there are material facts in dispute here. On the evidence assembled thus far, Paparo is entitled to have a jury decide whether he has proven his case.

### III. Conclusion

The district court's grant of summary judgment to defendant Denholm Ship Management, Ltd. is *reversed* and the case *remanded* to the district court for proceedings not inconsistent with this opinion.

---

6. Denholm suggests that the presence or absence of slack in the water *after* the accident is irrelevant and that the district court meant to refer to slack in the water *before* the accident.