# United States Court of Appeals
## For the First Circuit

No. 09-2173

RECTRIX AERODROME CENTERS, INC.,

Plaintiff, Appellant,

v.

BARNSTABLE MUNICIPAL AIRPORT COMMISSION, MICHAEL A. DUNNING,
BRUCE P. GILMORE, FRANCISCO SANCHEZ and QUINCY MOSBY,

Defendants, Appellees.

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

[Hon. Richard G. Stearns, U.S. District Judge]

Before

Lynch, Chief Judge,

Boudin and Lipez, Circuit Judges.

Marc E. Kasowitz with whom Kasowitz, Benson, Torres & Friedman
LLP was on brief for appellant.
Scott P. Lewis with whom Kevin D. Batt, Melissa C. Allison and
Anderson & Kreiger LLP were on brief for appellees.

June 23, 2010

**BOUDIN**, <u>Circuit Judge</u>.  Rectrix Aerodrome Centers, Inc. ("Rectrix") is a tenant at the Barnstable Municipal Airport that provides certain aviation services to planes using the airport.  It sued the Barnstable Municipal Airport Commission ("BMAC"),[1] two airport commissioners, two airport managers, and its outside counsel, claiming that they prevented Rectrix from competing with BMAC in the sale of jet fuel.  The district court dismissed some of Rectrix's claims and on others granted summary judgment against Rectrix.  The facts are as follows.

Beginning in 2002, Rectrix operated a hangar at the Barnstable Municipal Airport for private jets.  Rectrix's lease with BMAC provided that it could apply to BMAC to expand the scope of Rectrix's operations and become what is known in the industry as a "fixed base operator" or "FBO"--a service center that provides such things as fuel, oil, and hangar storage.  At the time, BMAC had in place a code of rules and regulations, which the parties refer to as the "minimum standards," that imposed standards of operation and maintenance on FBOs at the airport.  Rectrix says it did not see a copy of the minimum standards until 2004.

---

[1]Any city or town that establishes an airport must also establish an airport commission, "which shall have the custody, care and management of the municipal airport of said city or town." Mass. Gen. Laws ch. 90, § 51E (2010).  Massachusetts law confers upon such commissions various powers relating to airport operations, including, among other things, the powers to lease land, acquire property, set charges and rentals, expend funds, and promulgate rules and regulations. <u>Id.</u> §§ 51F-51J.

These standards (which have since been altered) provided in Article III.e as follows:

> A Fixed base operator shall provide all fuel services, including the sale and storage of 80-octane, 100-octane, and jet fuel, for as long as these grades are normally available for resale. The Barnstable Municipal Airport Commission may limit the types of fuel to be sold.

Not surprisingly, in this controversy about Rectrix's ability to sell jet fuel, Rectrix relies heavily on the first sentence; Barnstable, on the second.

According to BMAC, at least since 1979 it has reserved for itself the right to sell jet fuel at the airport, has declined to allow FBOs to do so, refused specifically on a prior occasion in 1983 to allow another FBO (Griffin Avionics, Inc.) to sell jet fuel, and has the blessing of both Massachusetts law and the Federal Aviation Administration ("FAA") for its right to follow this policy. Rectrix claims that revenues generated by jet fuel sales were illegally diverted to help support the town as well as the airport, but BMAC disputes any charge of unlawful conduct.

BMAC also asserts that when Rectrix first became a tenant in 2002, it had full notice of this reservation. BMAC points to a set of so-called "self service standards"--which are distinct from the minimum standards referenced above--dated August 15, 2000, that Rectrix received prior to signing its lease; this document says that "[a]s the proprietor of the Barnstable Airport, the Airport

Commission reserves the exclusive right unto itself to sell jet fuel on the Barnstable Airport."  The lease thereafter signed with Rectrix in August 2002 gave it the right to operate a hangar for corporate jets, but not to conduct FBO operations, and contained the following terms:

> 2a.  It is further agreed that Lessee shall not conduct or permit to be conducted on said premises any flight schools, or aircraft refueling activities specifically related to, and including resale of aviation or jet fuels, all subject to (2b) below.
>
> 2b. Lessee may at any time during the term of this Lease or additional terms thereof, submit in writing to the Barnstable Municipal Airport Commission, Lessee's desire to modify or expand its scope of operation. Lessee agrees that any change in its scope of operation may be subject to negotiable rates and charges, with agreed upon terms and conditions to be executed by both parties on separate letters of agreement.

Rectrix says it first learned of the minimum standards (as opposed to the self-service standards) in May 2004 and that it obtained a copy of those standards only in June 2004.  Soon after, in October 2004, Rectrix requested permission to expand its operations and become a full-service FBO; it says it wanted to become a full-service FBO at this point because it believed that the minimum standards would give it the right to sell jet fuel.[2]

---

[2]There is no evidence that Rectrix was granted permission to become a full-service FBO, but Rectrix's agreement with BMAC was modified to expand the size of its leasehold and the parties agreed to terms for Rectrix's self-fueling of aircraft it owned (or managed or leased under an exclusive contract of least 60 days);

Rectrix says that to prevent it from selling jet fuel, BMAC refused to give proper consideration to its application to become an full-service FBO, delayed approval on other applications as well, and imposed operating restrictions that complicated Rectrix's ability to serve its customers.  It says that it in various respects has been treated, to its disadvantage, differently than Griffin Avionics.  After arguments back and forth with BMAC, Rectrix began the law suit that has led to this appeal.

In its complaint filed in federal district court, Rectrix asserted a variety of claims against BMAC and the individuals named above arising under the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. § 1961 et seq. (2006), the Constitution and section 1983, 42 U.S.C. § 1983 (2006), and federal and state antitrust laws, 15 U.S.C. § 2 (2006); Mass. Gen. Laws ch. 93, §§ 1-14A (2010), along with various common law claims.

The district court granted a motion to dismiss Rectrix's antitrust claims, Rectrix Aerodome Ctrs., Inc. v. Barnstable Mun. Airport Comm'n, 534 F. Supp. 2d 201 (D. Mass. 2008) ("Rectrix I"), and later granted summary judgment in favor of Barnstable on its RICO and section 1983 claims, Rectrix Aerodome Ctrs., Inc. v. Barnstable Mun. Airport Comm'n, 632 F. Supp. 2d 120 (D. Mass. 2009) ("Rectrix II"). The district court then declined to retain

---

the memorandum specifically precluded Rectrix from selling fuel to third parties.

supplemental jurisdiction over the remaining state law claims. Id. at 132.

Rectrix now appeals both the grant of the motion to dismiss and the grant of summary judgment, both rulings being subject to de novo review. Gargano v. Liberty Int'l Underwriters, Inc., 572 F.3d 45, 48 (1st Cir. 2009); Paparo v. M/V Eternity, 433 F.3d 169, 172 (1st Cir. 2006). We address first the RICO and antitrust claims, both of which directly attack BMAC's restriction on jet fuel sales; the remaining claim, complaining of a civil rights violation under section 1983 and the Constitution, is considered thereafter.

RICO. Rectrix's first, and most detailed, argument on appeal is that the district court erred in rejecting Rectrix's RICO claim. A civil RICO claim, 18 U.S.C. § 1962(c), requires proof of several elements including the existence of a racketeering "enterprise" and its conduct through a "pattern" of racketeering activity, which requires at least two acts of racketeering so related, id. § 1961(4)-(5); the acts are ones specified in the statute and include mail and wire fraud as possible predicate acts. Id. §§ 1961(1), 1962(c).

Rectrix's claim of fraud rests at bottom on the proposition that it was entitled under the minimum standards then in force to sell jet fuel, that the defendants falsely represented that Rectrix lacked that right and concealed the minimum standards

until they were discovered by Rectrix in mid-2004, and that these acts of misrepresentation and concealment reflected a pattern of fraudulent acts that damaged Rectrix and are within the purview of the RICO statute. Rectrix also says that the defendants diverted revenues thus gained to Barnstable for its municipal use in violation of law and sought to conceal this as well.

The answer, as the district court ruled, Rectrix II, 632 F. Supp. 2d at 126-27, is that the minimum standards did not entitle Rectrix to sell jet fuel. Those standards provide that an FBO operator must supply fuel, including jet fuel, but qualify this in the next sentence by saying that BMAC "may limit the types of fuels to be sold." Before the lease was signed, and before Rectrix ever sought FBO status, the self-service standards BMAC gave to Rectrix told it that BMAC "reserves the exclusive right unto itself to sell jet fuel on the Barnstable Airport," and the lease itself expressly forbade Rectrix from selling any fuel.

Rectrix counters that the first sentence of the minimum standards describes jet fuel as a "grade" and the second sentence merely reserves BMAC's right to limit the particular "types" within the grade (Rectrix claiming there are separate "types" of jet fuel, such as Jet A-1, Jet A, and Jet B); but the straightforward reading is that the word "types" refers to the varieties given in the prior sentence, i.e., 80-octane, 100-octane, and jet fuel. In addition, the lease itself forbids Rectrix from providing any fuel.

-7-

It appears that the FAA itself is content to have municipal airports reserve jet fuel sales to themselves, seemingly so as to allow airports to fund maintenance and improvements.[3] Rectrix says that it was improper for BMAC to funnel any of the jet fuel profits for municipal use and that BMAC committed further acts of fraud by concealing this diversion from the FAA. But whether or not the diversion occurred or was improper--the district court made no finding--it was the reservation to BMAC of exclusive rights, not the diversion of BMAC profits, that caused damage to Rectrix.

Finally, Rectrix complains that when it sought FBO status, BMAC engaged in delays, proposed burdensome terms and otherwise hindered its application and operations. But nothing in the lease compels BMAC to surrender its exclusivity, and so long as BMAC maintained its exclusive rights, the premise of the RICO claim--that BMAC had no such exclusive rights--fails.

BMAC's minimum standards could have stated expressly its position that no one except itself could sell jet fuel at the airport instead of leaving this to the self-service standards and the lease. The lack of such a statement may explain some of its other actions, including its alleged delay in turning over the

_____

[3]See FAA Advisory Circular No. 150/5190-6, ¶ 1.3(b)(1) (Jan. 4, 2007); FAA Advisory Circular No. 150/5190-5 , ¶ 1-3(a) (June 10, 2002); see also Jet 1 Ctr., Inc. v. Naples Airport Auth., FAA Docket No. 16-04-03, Final Agency Decision, at 13 (July 15, 2005), available at http://part16.airports.faa.gov/pdf/16-04-03.pdf.

minimum standards and in processing Rectrix's request for FBO status. But given the qualification in the minimum standards, the explicit restrictions in the self-service standards and the lease with Rectrix amply establish that Rectrix never had a right under its lease or airport regulations to sell jet fuel at the airport.

Antitrust law. Alternatively, Rectrix claims that restricting Rectrix from selling jet fuels at the airport violates section 2 of the Sherman Act, which forbids monopolization, attempted monopolization and conspiracies to monopolize. 15 U.S.C. § 2. The district court rejected this claim without reaching the merits, relying on federal antitrust law's so-called state action doctrine (quite different from the constitutional doctrine that shares the same name) and a leading precedent of this court. Rectrix I, 534 F. Supp. 2d at 203-06.

The state action doctrine was originally adopted by the Supreme Court in Parker v. Brown, 317 U.S. 341, 347-52 (1943), to immunize from attack under the federal antitrust laws a regulatory scheme, adopted by statute, by which California required raisin growers to deliver the majority of their raisins into a common pool in exchange for set payments--a practice that might be treated as unlawful price fixing if arranged without state approval. The Sherman Act, said the Court, does not automatically forbid the state from imposing restrictions on competition that private citizens could not have adopted for themselves. Id. at 351-52.

From this decision has flowed a host of refining decisions, one subset of which is concerned with actions taken by municipalities.

Although not automatically treated as states, municipal entities (like BMAC) can invoke state action immunity--as can municipal officials acting for them, Fisichelli v. Town of Methuen, 956 F.2d 12, 15-16 (1st Cir. 1992) (Breyer, C.J.)--if they act pursuant to a "clearly articulated and affirmatively expressed" state policy to displace competition with regulation.[4]  The policy must authorize the municipal entity both to regulate the conduct and to "suppress competition," City of Columbia v. Omni Outdoor Adver., Inc., 499 U.S. 365, 372 (1991); but the latter purpose is inferred if suppression is a foreseeable result of a broad delegation, id. at 373; Town of Hallie, 471 U.S. at 42-43; Fisichelli, 956 F.2d at 14.

The defendants' claim of immunity rests on the language of Mass. Gen. Laws ch. 90, §§ 51D-51M, the Massachusetts statute governing municipal airports.  One provision grants the power to "airport commission[s]" to "adopt rules and regulations for the use of municipal airports," id. § 51J; others grant airports authority to "determine the charges or rentals for the use of any properties, facilities, installations, landing fees, concessions, uses and

---

[4]Town of Hallie v. City of Eau Claire, 471 U.S. 34, 38-39 (1985); City of Lafayette v. La. Power & Light Co., 435 U.S. 389, 410, 413 (1978) (plurality opinion); Hovenkamp, Federal Antitrust Policy §20.6, at 753-54(3d ed. 2005).

services," id. § 51H, and to lease airport land for up to 20 years "under such terms and conditions as it may prescribe, for hangars, shops, storage, industrial purposes, offices and other space rental, and for concessions," id. § 51F.

This may seem a rather bland basis for attributing to the state legislature a purpose to allow the suppression of competition, but the case law has interpreted the protection hospitably. Hovenkamp, supra, §20.6, at 753-54 & n.12. In all events, the Massachusetts statute involved here goes out of its way to include a section specifically prohibiting exclusive contracts related to transportation to and from the airport, id. § 51M, which surely suggests that the legislature did perceive that the airport might otherwise employ exclusivity restrictions (and chose to ban only this narrow set).

The most direct precedent is this court's reading of very similar language in the enabling statute that governs the Massachusetts Port Authority--the entity that runs Boston's Logan Airport--as conferring state action immunity on the authority. Interface Group, Inc. v. Mass. Port Auth., 816 F.2d 9, 12-14 (1st Cir. 1987); Mass. Gen. Laws ch. 91 app., §§ 1-3, 1-14 (2010). Cases from other circuits have similarly found that municipal airports can benefit from state action immunity; of course, these decisions involved different statutes, but the operative language

was in many instances similar and, anyway, their basic outlook is consistent with our reading of the Massachusetts statute.[5]

District court cases are in some tension in their construction of like statutes. New York Airlines, Inc. v. Dukes County, 623 F. Supp. 1435, 1451 (D. Mass. 1985), said that Massachusetts law governing municipal airports "[did] not on [its] face demonstrate a clear intent on the part of the state to displace competition . . . in the management of [airports]." But this case preceded both the Supreme Court's Omni decision and our decision in Interface, which control this panel. Williams v. Ashland Eng'g Co., 45 F.3d 588, 592 (1st Cir. 1995).

In its reply brief and at oral argument, Rectrix argued that provisions in Mass. Gen. Laws ch. 90, §§ 51H, 51J, say that in the contracts airports execute "the public shall not be deprived of its rightful, legal and uniform use of such properties, facilities and installations" and that airports' "rules and regulations shall conform to and be consistent with the laws of the commonwealth."

---

[5]E.g., Montauk-Caribbean Airways, Inc. v. Hope, 784 F.2d 91, 96 (2d Cir.), cert. denied, 479 U.S. 872 (1986); Indep. Taxicab Drivers' Employees v. Greater Houston Transp. Co., 760 F.2d 607, 610-11 (5th Cir.), cert. denied, 474 U.S. 903 (1985); Four T's, Inc. v. Little Rock Mun. Airport Comm'n, 108 F.3d 909, 914-15 (8th Cir. 1997); Cal. Aviation, Inc. v. City of Santa Monica, 806 F.2d 905, 907-08 (9th Cir. 1986); Allright Colo., Inc. v. City & County of Denver, 937 F.2d 1502, 1508-09 (10th Cir.), cert. denied, 502 U.S. 983 (1991); Commuter Transp. Sys., Inc. v. Hillsborough County Aviation Auth., 801 F.2d 1286, 1290 (11th Cir. 1986); see also Hillman Flying Serv., Inc. v. City of Roanoke, 652 F. Supp. 1142, 1145-46 (W.D. Va. 1987), aff'd mem., 846 F.2d 71 (4th Cir. 1988).

Apart from the rule that arguments not made in the opening brief are waived, e.g., Sandstrom v. ChemLawn Corp., 904 F.2d 83, 86 (1st Cir. 1990), this language does not negate an expectation that exclusivity arrangements might be employed.

Cases like Omni reflect an ambivalence, shared by Congress as well, e.g., 15 U.S.C. §§ 34-36 (restricting damages in antitrust suits against local governments and their officials acting in an "official capacity"), as to how far municipalities ought to be restricted by the antitrust laws. States and their subordinate units commonly mingle governmental services, regulation and financial self-interest, while being subjected in some measure to restrictions that do not apply to private entities engaged in the same activities.[6]

The evolution of the state action doctrine as applied to municipalities is far from over, but our own Interface decision is sufficient to resolve this case. It is worth adding that Rectrix is mistaken in its notion that its antitrust claim would otherwise face fair sailing. How far the antitrust laws require property owners to allow outsiders onto their property to compete with them in selling goods or services is disputable, and private owners--for

---

[6]For example, in this case, as already noted, Massachusetts has a statute that governs municipal airports that would not apply to a private airport. Mass. Gen. Laws ch. 90, §§ 51D-51M. See also Town of Hallie, 471 U.S. at 45 n.9 (noting that municipal entities may be subject to disclosure regulations that do not apply to private entities).

example, shopping centers--commonly enter into leases with clauses that limit competition.[7]

Civil rights. Rectrix's remaining federal claim was brought under 42 U.S.C. § 1983, which creates civil liability for civil rights violations by state and local governments, and the right invoked by Rectrix is the right of equal protection guaranteed under the Fourteenth Amendment, U.S. Const. amend. XIV, § 1. This claim differs from the RICO and antitrust claims because its main target is not the restriction of jet fuel sales but other alleged disparities in the treatment of Rectrix and other airport tenants.

The specifics of Rectrix's claim have evolved over time. In the district court, Rectrix claimed that another tenant--Griffin Avionics--was allowed to use a public ramp to which Rectrix was denied access and claimed that a third tenant Silvia Aviation received various forms of preferential treatment. Rectrix II, 632 F. Supp. 2d at 129. On appeal, Rectrix makes no mention of Silvia but tries to add two further alleged instances of discrimination

---

[7]See Christy Sports, LLC v. Deer Valley Resort Co., 555 F.3d 1188, 1194-95 (10th Cir. 2009); Elliott v. United Ctr., 126 F.3d 1003, 1005 (7th Cir. 1997) (Wood, J.), cert. denied, 523 U.S. 1021 (1998); III Areeda & Hovenkamp, Antitrust Law ¶ 703b, at 152-57 (2d ed. 2002); XI Hovenkamp, Antitrust Law ¶ 1800a2, at 5-6 (2d ed. 2005); XII id. ¶ 2033c, at 195-97 (1999); XIII id. ¶ 2134d1, at 204-07 (2d ed. 2005); Handler & Lazaroff, Restraint of Trade and the Restatement (Second) of Contracts, 57 N.Y.U. L. Rev. 669, 695-703 (1982).

favoring Griffith, which were at best only partially developed in the district court.[8]

The Equal Protection Clause is usually deployed in cases involving state or local curtailment of personal constitutional rights (e.g., against racial discrimination) and ordinarily against generic distinctions made in statutes or regulations. But economic interests can also be protected, although more latitude is allowed to the government; and individual inequalities, as opposed to ones imposed generically, are potentially--although not easily--reached by so-called "class of one" discrimination claims. E.g., Vill. of Willowbrook v. Olech, 528 U.S. 562, 564 (2000) (per curiam); Wojcik v. Mass. State Lottery Comm'n, 300 F.3d 92, 104-05 (1st Cir. 2002).

The single clearly developed and specific claim of alleged discrimination was supported by only one sentence in an affidavit from Rectrix's CEO that reads (in full):

> Additionally, on occasions where Rectrix needs additional space to park aircraft (an issue necessitated in part by defendants' refusal to grant Rectrix's request for additional ramp

---

[8]First, Rectrix complains that the airport discriminated between Griffin and Rectrix with respect to fuel tank usage. However, Rectrix never developed this claim below: rather, Rectrix complained that BMAC allowed third parties to use Griffin's fuel tank while not allowing Rectrix to use Air Cape Cod's fuel tank; but at most these allegations would indicate discrimination between Air Cape Cod and Griffin or between other third parties and Rectrix--not between Griffin and Rectrix. Second, Rectrix says the airport refused to provide timely fuel service to Rectrix's customers and imposed on it a fueling policy that did not apply to Griffin. But below, Rectrix did not mention Griffin in connection with these allegations, much less show discrimination.

> space), Rectrix has been told that it cannot use various public areas of the Airport, although Griffin Avionics and other Airport tenants have been able to use the same space.

The district court, Rectrix II, 632 F. Supp. 2d at 129-30, said that this claim failed because Rectrix did not show that it was similarly situated to the other, allegedly favored tenants or users--a settled requirement for equal protection claims, e.g., Vill. of Willowbrook, 528 U.S. at 564; Buchanan v. Maine, 469 F.3d 158, 177-78 (1st Cir. 2006).

In claiming that Griffin (and unnamed other companies) was allowed greater use of airport space outside its leased premises, Rectrix provided no details about the comparability of Griffin to itself and the precise circumstances of the episodes; it cites letters it wrote asking for more ramp space, but none even mentions Griffin's supposed better treatment. Still fewer details were provided on the other allegations Rectrix now says were instances of pro-Griffin discrimination. See note 8, above.

The district court properly relied on holdings in our earlier cases that place the burden on the plaintiff in class-of-one cases to show such identity of entities and circumstances to a high degree. See Rectrix II, 632 F. Supp. 2d at 130. Rectrix argues that the principal case cited--Cordi-Allen v. Conlon, 494 F.3d 245, 251-52 (1st Cir. 2007)--was a land-use case and so its language should not apply here. But core equal protection concerns aside, class-of-one plaintiffs face the same burden outside of the

land-use context as well.  See, e.g., Buchanan, 469 F.3d at 178; Pagan v. Calderon, 448 F.3d 16, 34-37 (1st Cir. 2006).

Further, the reason articulated in Cordi-Allen for requiring a strict showing of comparability applies with full force here.  Drawing distinctions is what legislators and regulators do every day: without this comparability sieve, every routine governmental decision at the state and local level--of which there are millions every year--could become a class-of-one case in federal court.  Cf. Engquist v. Or. Dep't of Agric., 128 S. Ct. 2146, 2156-57 (2008); Vill. of Willowbrook, 528 U.S. at 565-66 (Breyer, J., concurring in result); Pagan, 448 F.3d at 34-35.

To sum up, Rectrix was a commercial tenant of the airport and, given the self-service standards and lease terms, had no right and no reasonable expectation of being able to sell jet fuel at the airport and so no fraud claim whatever.  The antitrust claim, dubious on the merits, is barred by the state action doctrine given the Massachusetts statute.  And so far is its equal protection claim is aimed to secure a general right to make jet fuel sales, no private entity at the airport has the privilege sought by Rectrix.

Affirmed.