IN THE SUPREME COURT OF THE STATE OF MONTANA

OP 11-0526

2012 MT 61

_____

AMERICAN ZURICH INSURANCE COMPANY,

       Petitioner,

   v.

MONTANA THIRTEENTH JUDICIAL DISTRICT
COURT, YELLOWSTONE COUNTY and
HONORABLE GREGORY R. TODD, District Court
Judge,

       Respondents.

OPINION
AND
ORDER

_____

¶1    American Zurich Insurance Company (Zurich) seeks a writ of supervisory control, arguing that the Thirteenth Judicial District Court is proceeding based on a mistake of law in controlling discovery with respect to matters protected by the attorney-client privilege and the work product doctrine. We accept review of the petition in this instance because the case presents a purely legal issue for which, if the District Court erred, there would be no adequate remedy on appeal. For the reasons that follow, we conclude the District Court correctly applied the law of attorney-client privilege, but incorrectly analyzed the work product doctrine. However, since the court reached the proper conclusion, supervisory control is unnecessary and we dismiss the petition.

**FACTUAL AND PROCEDURAL BACKGROUND**

¶2    Phillip Peters suffered a serious injury on January 18, 1999, while working at Roscoe Steel & Culvert Co. (Roscoe). He later filed a workers' compensation claim. Zurich, which insured Roscoe under Plan II of the Montana Workers' Compensation Act, accepted liability for Peters's claim. Zurich contracted with Employee Benefit

1

Management Solutions (EBMS), a third-party adjuster, to provide services for Peters's claim. EBMS employee Jim Kimmel was responsible for adjusting Peters's claim. Kimmel stated in his deposition that he had the "absolute authority" to adjust Peters's workers' compensation claim.

¶3 Over the course of several years, Peters and Zurich disagreed over elements of Peters's claim, including the level of his impairment and other issues. During this time, attorney Joe Maynard of the Crowley Law Firm advised Zurich on various legal matters. Maynard prepared an opinion and evaluation letter regarding Peters's case, dated October 7, 2003 (Maynard Letter). The letter was prepared in advance of a mediation held October 10, 2003. Maynard sent the letter to Kimmel, who then wrote notes on the letter reflecting his conversation with Maynard. Without Zurich's or Maynard's knowledge or permission, Kimmel provided a copy of his annotated letter to Roscoe.

¶4 Although the case did not settle as a result of the 2003 mediation, the parties eventually resolved Peters's underlying disability benefits claim. Peters filed the present action in May 2008 for unfair claims settlement practices, naming Zurich and Kimmel as defendants. On May 6, 2011, Peters served Roscoe with a Subpoena Duces Tecum requesting Roscoe's "entire file and all documentation relating to Mr. Peters's employment, his injury of January 18, 1999, his workers' compensation claim regarding this injury, and any and all correspondence either written or electronic or in whatever form, with Zurich, EBMS, and the Crowley Law Firm regarding Mr. Peters." Roscoe, represented by separate counsel, objected to the subpoena and filed an action to quash it, citing attorney-client privilege and the work product doctrine. In its July 7th order, the court denied Roscoe's motion and ordered Roscoe to produce the Maynard Letter. The court held that the letter was not protected by attorney-client privilege because Roscoe was neither a party to the action nor had a shared legal interest with Zurich. The court similarly found the letter was not protected by the work product doctrine since Roscoe had no legal interest in the claim and was not acting as Zurich's agent, attorney, or consultant. Zurich then filed a motion for relief from the court's order to produce. The

2

court denied Zurich's motion, and Zurich petitioned this Court for a writ of supervisory control.

## DISCUSSION

¶5    *1. Propriety of Supervisory Control.*

¶6    Pursuant to Article VII, Section 2(2) of the Montana Constitution, this Court may exercise supervisory control over other courts. The Court is justified in doing so when "urgency or emergency factors exist, making the normal appeals process inadequate, when the case involves purely legal questions, and when . . . the other court is proceeding under a mistake of law and is causing a gross injustice." M. R. App. P. 14(3). The grant of a writ of supervisory control is an extraordinary remedy. *Stokes v. Mont. Thirteenth Jud. Dist. Ct.*, 2011 MT 182, ¶ 5, 361 Mont. 279, 259 P.3d 754. "We will assume supervisory control over a district court to direct the course of litigation if the court is proceeding based on a mistake of law, which if uncorrected, would cause significant injustice for which appeal is an inadequate remedy." *Stokes*, ¶ 5 (citing *Simms v. Mont. Eighteenth Jud. Dist. Ct.*, 2003 MT 89, ¶ 18, 315 Mont. 135, 68 P.3d 678).

¶7    We find it appropriate to review Zurich's contentions. We requested supplemental briefing and oral argument in this case because the question presented is one of first impression and raises an issue of law: whether, in a claim for workers' compensation benefits, an attorney's communication to its client insurer is privileged when the client voluntarily discloses the communication to the non-client employer. Normal channels of appeal would prove inadequate. We have recognized that compelled discovery of potentially-privileged material presents unique issues that, under certain circumstances, are "sufficient to invoke original jurisdiction." *Inter-Fluve v. Mont. Eighteenth Jud. Dist. Ct.*, 2005 MT 103, ¶ 1, 327 Mont. 14, 112 P.3d 258 (quoting *Winslow v. Mont. Rail Link, Inc.*, 2001 MT 269, ¶ 2, 307 Mont. 269, 38 P.3d 148). If the District Court did err in ordering production of the Maynard Letter, later appeal would provide no relief for Zurich because the purportedly confidential contents of the letter would be exposed. However, while we accept review of the petition, we decline to exercise supervisory

3

control in this case. As explained below, though the District Court erred in its analysis of the work product doctrine, its analytical error does not affect the correctness of its decision to require production of the letter. We take the opportunity to explain our reasoning in order to promote judicial efficiency and to avoid a later appeal of the issue in this case.

¶8    *2. Whether Kimmel's actions waived Zurich's attorney-client privilege.*

¶9    The attorney-client privilege protects communications between attorney and client during the course of the professional relationship.

> The fundamental purpose of the attorney-client privilege is to enable the attorney to provide the best possible legal advice and encourage clients to act within the law. The privilege furthers this purpose by freeing clients from the consequences or the apprehension of disclosing confidential information, thus encouraging them to be open and forthright with their attorneys.

*Inter-Fluve*, ¶ 22. The privilege serves to ensure attorneys freely give accurate and candid advice to their clients without the fear it later will be used against the client. *Inter-Fluve*, ¶ 22 (citing *Palmer by Diacon v. Farmers Ins. Exch.*, 261 Mont. 91, 107, 861 P.2d 895, 904-05 (1993)).

¶10    While serving these underlying policy goals, the privilege must be construed narrowly because it obstructs the truth-finding process. *Westinghouse Elec. Corp. v. Republic of Philippines*, 951 F.2d 1414, 1423 (3rd Cir. 1991). The privilege "protects only those disclosures—necessary to obtain informed legal advice—which might not have been made absent the privilege." *Fisher v. U.S.*, 425 U.S. 391, 403, 96 S. Ct. 1569, 1577 (1976). The purpose is to encourage full and frank communication, not as an end in itself, but as a means to promote "broader public interests in the observance of law and administration of justice." *Upjohn Co. v. U.S.*, 449 U.S. 383, 389, 101 S. Ct. 677, 682 (1981).

4

¶11 As a general rule, the privilege extends only to communications between an attorney and a client. There are specific exceptions, however, which permit communications involving third parties to receive the same protection. *Westinghouse,* 951 F.2d at 1424. Attorney-client communications may be protected if disclosed to another party "where the parties undertake a joint effort with respect to a common legal interest." *U.S. v. BDO Seidman, LLP*, 492 F.3d 806, 816 (7th Cir. 2007). Such disclosures may be privileged if communicating with the third party is "*necessary* for the client to obtain informed legal advice." *Westinghouse*, 951 F.2d at 1424 (emphasis added). These third parties may be co-litigants, or other professionals assisting the attorney in representing the client. *Westinghouse*, 951 F.2d at 1424; *In re Rules of Prof'l Conduct*, 2000 MT 110, ¶ 60, 299 Mont. 321, 2 P.3d 806 (citing *U.S. v. Mass. Inst. of Tech.*, 129 F.3d 681, 684 (1st Cir. 1997)). The lawyer's need to communicate with these third parties must be "appropriate, even if not vital, to the consultation." *In re Rules*, ¶ 60 (citing *Mass. Inst. of Tech.*, 129 F.3d at 684). Known variously as "joint defense agreements," the "joint prosecution privilege," or the "common interest doctrine," the shared privilege generally is limited to parties involved in litigation or impending litigation, or where the third party has "a common legal interest for the purpose of rendering legal advice to the client." *Hanover Ins. Co. v. Rapo & Jensen Ins. Servs., Inc.*, 870 N.E.2d 1105, 1109-10 (Mass. 2007).

¶12 The intersection of workers' compensation law and the attorney-client privilege presents a unique issue. The Montana Workers' Compensation Act provides the employee's exclusive remedy for workplace injury. By law, the employer's role in workers' compensation cases is limited. With extremely narrow exceptions, the employer is statutorily immune from suit for common law injury claims. Sections 39-71-411, 413, MCA. Montana statutes require an employer to elect one of three plans for insuring workers' compensation liability. Pertinent here is Plan II, under which the employer purchases coverage through an authorized insurance company. Section 39-71-2201, MCA. The Plan II insurer is directly and primarily liable to the employee, and

5

must pay directly to the employee any compensation for which the employer is liable. Section 39-71-2203(3), MCA.

¶13 Moreover, the insurer's duty to compensate the employee cannot be delegated to the employer, nor can the employer veto or influence any settlement between the insurer and the employee. *Hernandez v. Nat'l Union Fire Ins. Co. of Pittsburgh*, 2003 MTWCC 5, ¶ 1, 2003 MT Wrk. Comp. LEXIS 4. The rules of the Workers' Compensation Court, promulgated after extensive participation by attorneys for claimants, insurers and employers, make clear that the employer is not to be named as a party to an action for benefits, except in cases involving the uninsured employers' fund or involving a request for relief against an employer. Admin. R. M. 24.5.301(4). With those limited exceptions, the employer is not at risk in the action, though it retains a "duty to cooperate and assist its insurer, including any duty to assist in responding to discovery." Admin. R. M. 24.5.301(4). It is thus improper for an insurer and an employer to collaborate on settlement of a worker's claim for benefits. Consistent with the Workers' Compensation Court rules, Roscoe was not named as a party in Peters's compensation claim before that Court.

¶14 To be sure, an employer and an insurer share legal interests in the workers' compensation arena. The employer and insurer must work together to promote safety on the job, to assist employees in prompt return to work after an injury, and to prevent fraudulent claims. Sections 39-71-107(1), 39-71-316, 39-71-613(4), 45-6-301(5), MCA. Even outside the workers' compensation system, though, "the relationship between an insurer and insured is permeated with potential conflicts." *In re Rules*, ¶ 37. As we have previously stated, the common interest in keeping litigation and premium costs down, by itself, is not sufficient to extend the privilege beyond the attorney-client relationship. *In re Rules*, ¶ 70.

¶15 Where two parties are engaged in a joint defensive effort against a claim, the privilege may attach (*In re Rules*, ¶ 72), but that is not the case here. Despite their common interests in some areas, an employer and an insurer do not share a common legal

interest in the adjustment of an employee's claim for compensation for which the insurer exclusively is liable. In evaluating and settling Peters's benefits claim, Zurich bore direct liability to Peters. Roscoe's role as an employer during the adjustment process was similar to that of a witness—it would be called upon to provide background information to Zurich about the employee's duties, history and facts about the injury. *See* Admin. R. M. 24.5.301(4). While the employer supplies information to the insurer in its evaluation of a compensation claim, the employer is not a co-litigant and bears no liability. Indeed, the employer is not solely aligned with the insurer in an adversarial position against the employee, but shares common interests with both the insurer and the employee. The employer and employee share an interest in avoiding an insurer's unreasonable denial of liability or termination of benefits (§§ 39-71-611, 612, MCA), and have a common interest in rehabilitation and speedy adjustment of the claim to facilitate prompt medical treatment for the employee's injuries and hasten the employee's return to work (§ 39-71-105(3), MCA).

¶16 In addition, Kimmel's disclosure of the Maynard Letter to Roscoe was not necessary for Zurich to obtain legal advice. Roscoe had a duty to provide Zurich with information to facilitate Zurich's evaluation of the claim, but the necessity for information only flows in one direction *in this context*. In light of the law barring an employer in Plan II cases from participating in the adjustment of the claim, it was not necessary or appropriate for Zurich to communicate its settlement strategy with Roscoe. Peters's expression of interest in suing Roscoe (Dissent, ¶ 43) did not bring Roscoe's legal interests into the adjustment of the benefits claim. To the contrary, an employer's legal interests most likely would be at odds with those of its insurer were the employee to seek exemption from workers' compensation exclusivity by alleging intentional acts. *See* § 39-71-414, MCA. In any event, "[t]he litigation looming on the horizon" was only that pending in the Workers' Compensation Court, involving solely Zurich and Peters. *FEC v. Christian Coalition*, 178 F.R.D. 61, 73 (E.D. Va. 1998). As the District Court

7

correctly concluded, Roscoe was neither a party to the action nor shared a common interest with Zurich in the adjustment of Peters's claim.

¶17  "[F]or the common interest doctrine to apply, the parties must share a common legal interest, rather than a commercial or a financial interest." *FSP Stallion 1, LLC v. Luce*, 2010 U.S. Dist. LEXIS 110617, *58 (D. Nev. 2010).  Extension of the shared privilege to a *non-party* is based on the non-party's legal interest in the matter, not on the amorphous concept of its "expertise" or knowledge of matters involved in the case.  *See, e.g., In re Grand Jury Subpoenas*, 902 F.2d 244, 249 (4th Cir. 1990) (common interest doctrine applied to related corporate entities pursuing a joint claim).  The common interest doctrine "'does not extend [to] communications about a joint business strategy that happens to include a concern about litigation.'" *FSP Stallion 1*, at **58-59 (quoting *Walsh v. Northrop Grumman Corp.*, 165 F.R.D. 16, 18 (E.D.N.Y. 1996)).

¶18  In *FSP Stallion 1*, the common interest doctrine was invoked by a number of defendants sued for violation of federal and state securities laws.  The plaintiffs claimed the defendants—a group of individuals and their business entities—had conspired to develop a scheme to fraudulently induce investors to purchase tenant-in-common interests at an inflated price.  They sought production of documents relating to the drafting and preparation of the Private Placement Memorandum (PPM) used to solicit investors, which the defendants claimed were protected by a shared privilege since all had participated together in preparing the PPM.  *FSP Stallion 1*, at **14-15.  The court refused to apply the privilege to the documents in question, ruling that "[t]he common interest doctrine does not extend to communications about a joint business or financial transaction, merely because the parties share an interest in seeing the transaction is legally appropriate."  Additionally, the court noted, "[a] desire to comply with applicable laws and to avoid litigation does not transform their common interest and enterprise into a legal, as opposed to a commercial, matter." *FSP Stallion 1*, at *67.

¶19  Like the defendants in *FSP Stallion 1*, although Roscoe and Zurich may have shared a desire to avoid litigation and to comply with the workers' compensation laws,

8

Roscoe did not share a common legal interest in the adjustment of Peters's claim and thus was not protected by Zurich's privilege with its counsel.

¶20 Finally, we examine whether Zurich waived its attorney-client privilege in transmitting the letter to Roscoe. The attorney-client privilege is held by the client and may be waived by voluntary disclosure. M. R. Evid. 503; *State v. Tadewalt*, 2010 MT 177, ¶ 17, 357 Mont. 208, 237 P.3d 1273. "Voluntary disclosure to a third party of purportedly privileged communications has long been considered inconsistent with an assertion of the privilege." *Westinghouse*, 951 F.2d at 1424. Disclosure to third parties waives attorney-client privilege unless disclosure is necessary for the client to obtain informed legal advice. *Westinghouse*, 951 F.2d at 1425. We already have concluded the disclosure was unnecessary for Zurich to obtain legal services. However, Zurich contends Kimmel was not authorized to waive the privilege.

¶21 Zurich cites *Inter-Fluve* for the principle that a corporate attorney-client privilege is normally only exercised and waived by its officers and directors. ¶ 33. Since Kimmel was merely a claims adjuster, Zurich contends he had no such authority. We disagree. Section 39-71-107(2), MCA, details the extensive authority a Montana claims adjuster must have when examining and managing workers' compensation claims. Consistent with the requirements of state law, Kimmel acknowledged he had "absolute authority" over management of Peters's claim. In *Inter-Fluve*, we quoted the United States Supreme Court's analysis of the attorney-client privilege in a corporate context, stating all corporate action "must necessarily be undertaken by individuals empowered to act on behalf of the corporation." ¶ 33 (quoting *Commodity Futures Trading Comm'n v. Weintraub*, 471 U.S. 343, 348, 105 S. Ct. 1986, 1991 (1985)). Not only was Kimmel empowered to act on behalf of the corporation in this instance, Montana law requires his authority in the adjustment process. Thus, Kimmel was authorized to waive Zurich's privilege.

¶22 In sum, we conclude the District Court properly applied the law in determining the attorney-client privilege does not authorize Roscoe to withhold the Maynard Letter.

9

Roscoe was not a party to the action, nor did it share a common legal interest in Zurich's adjustment of the workers' compensation claim. Zurich's disclosure of the letter via Kimmel to Roscoe constitutes a waiver of its attorney-client privilege.

¶23　　*3. Whether the Maynard Letter is protected by the work product doctrine.*

¶24　　While the District Court properly concluded the attorney-client privilege did not apply, it failed to conduct a separate analysis of the work product doctrine, stating only that because Roscoe had no legal interest in the matter, waiver of the work-product privilege necessarily followed. Zurich argues this approach was flawed, because Roscoe was not its "adversary" in the workers' compensation proceeding. Zurich is correct that waiver of the attorney-client privilege by voluntary disclosure does not necessarily waive confidentiality of attorney work product. *U.S. v. Deloitte LLP*, 610 F.3d 129, 139 (D.C. Cir. 2010). The purpose of the two privileges differs. The attorney-client privilege protects confidential communications, thereby promoting the attorney-client relationship and the functioning of the legal system. *Westinghouse*, 951 F.2d at 1428. By contrast, the work product doctrine serves the adversarial process directly "by enabling attorneys to prepare cases without fear that their work product will be used against their clients." *Westinghouse*, 951 F.2d at 1428 (citing *Hickman v. Taylor*, 329 U.S. 495, 510-11, 67 S. Ct. 385, 393-94 (1947)). Critical to the distinction is whether the disclosure "enable[s] an adversary to gain access to the information." *Westinghouse*, 951 F.2d at 1428; Charles Alan Wright, Arthur R. Miller & Richard L. Marcus, *Federal Practice & Procedure* vol. 8, § 2024, 531-32 (3d ed., West 2010) ("[t]he purpose of the work-product rule 'is not to protect the evidence from disclosure to the outside world but rather to protect it only from knowledge of opposing counsel and his client.'"). The mere disclosure itself, therefore, does not trigger waiver of work product protection.

¶25　　We discussed in *Palmer* the great protections to be afforded to opinion work product, setting a high bar against compelled production. Our discussion concluded with the observation that "materials that contain the mental impressions and opinions of [counsel] are immune from discovery under the work-product doctrine, unless a waiver

10

occurred." *Palmer*, 261 Mont. at 118, 861 P.2d at 912. We partially analyzed disclosure in the insurer-insured context in *In re Rules*. There, we analyzed client confidentiality obligations under Rule 1.6, M. R. Prof. Conduct, which is broader in both scope and protection than the attorney-client privilege and the work product doctrine. *In re Rules*, ¶ 77. The case dealt with unauthorized disclosures by insured's counsel to third-party auditors, whom the Court found were not "needed in the representation" or "appropriate . . . to a consultation." *In re Rules*, ¶ 71. In fact, third-party auditors stood in potential conflict with the interests of the insured, as their mission is partially to find fault with legal charges. *In re Rules*, ¶ 75. The Court made clear it was not holding "that the disclosure of detailed descriptions of professional services to a third-party auditor necessarily violates any privilege that may attach to them. Resolution of that issue would clearly entail findings of fact that we have not made in the present case." *In re Rules*, ¶ 73. This case requires more exacting analysis of when disclosure to a third party nullifies work product protection.

¶26 The purpose underlying the work product doctrine requires us to distinguish between disclosures to adversaries and disclosures to non-adversaries. *Westinghouse*, 951 F.2d at 1428. Disclosure only waives work product protection if it is "inconsistent with the maintenance of secrecy from the disclosing party's adversary." *Deloitte*, 610 F.3d at 140 (quoting *Rockwell Int'l Corp. v. U.S. Dep't of Justice*, 235 F.3d 598, 605 (D.C. Cir. 2001)). Further, when determining if a party is or is not an adversary, "the question is not whether [the employer] could be the [insurer]'s adversary in any conceivable future litigation, but whether [the employer] could be [the insurer's] adversary in the sort of litigation the [documents in question] address." *Deloitte*, 610 F.3d at 140; see also *Kimberly-Clark Worldwide v. First Quality Baby Prods., LLC*, 2011 U.S. Dist. LEXIS 133551, **7-8 (E.D. Wis. 2011).

¶27 If the disclosure is to a non-adversary, but the recipient is a "conduit" to an adversary, the court examines whether the disclosing party had a reasonable basis for believing the recipient would keep the disclosed material confidential. *Deloitte*, 610 F.3d

11

at 141.  A reasonable expectation of confidentiality may derive from "common litigation interests between the disclosing party and the recipient" or "may be rooted in a confidentiality agreement or similar arrangement between the disclosing party and the recipient."  *Deloitte*, 610 F.3d at 141.  Absent common interests, we inquire as to whether a confidentiality agreement or other assurance gave the disclosing party a reasonable expectation that the recipient would keep its work product confidential.  *Deloitte*, 610 F.3d at 142.  In *Deloitte*, the court concluded the disclosing party had a reasonable expectation the recipient would keep the information confidential because the recipient was bound by rules of professional conduct governing accountants, which include confidentiality requirements.  610 F.3d at 142.

¶28    We conclude that Roscoe was neither an adversary of Zurich nor necessarily a conduit to Peters.  As recognized by the District Court, Roscoe had no legal interest in the adjustment of Peters's claim.   While Roscoe was not adversarial to Zurich, its overlapping relationship with both Peters and Zurich makes Zurich's expectations of confidentiality in Roscoe during the claims adjustment process unreasonable.  Given the law expressly excluding Roscoe from participation in and liability for the claim, there could be no basis for either a confidentiality agreement or assurances of confidentiality.  "Common sense suggests that there can be no joint defense agreement when there is no joint defense to pursue."  *In re Grand Jury Subpoena*, 274 F.3d 563, 575 (1st Cir. 2001).

¶29    The District Court did not apply the correct legal standard to the work product analysis, but it reached the proper conclusion.  Relying on the standards announced in *Deloitte*, we conclude that Roscoe's effective status as a disinterested third party, and its preclusion by law from participating in the adjustment of the compensation claim, could not support a reasonable expectation that Zurich's work product would be kept confidential.  Zurich's disclosure of the letter therefore waives work product protection.  Our holding here does not impact work product protection where an insurer and insured have a common legal interest in the underlying litigation.

¶30   IT IS THEREFORE ORDERED that Zurich's petition for a writ of supervisory control is dismissed.

DATED this 13th day of March, 2012.


/S/ BETH BAKER


We concur:


/S/ MIKE McGRATH
/S/ JAMES C. NELSON
/S/ PATRICIA COTTER
/S/ MICHAEL E WHEAT
/S/ BRIAN MORRIS



Justice James C. Nelson, concurring.

¶31   I join the Court's Opinion.   Aside from the Court's finely-tuned legal analysis, with which I agree, I suggest there is another fundamental point in this case that needs to be emphasized.

¶32   It needs no citation to authority that in the typical workers' compensation case, the employer enjoys immunity from suit by the injured worker.[1]   The "quid pro quo" for this immunity from suit is that the injured worker is entitled to receive benefits under the Workers' Compensation Act (WCA), Title 39, chapter 71, MCA, without having to prove fault—and, theoretically at least, without (or with minimal assistance of) an attorney.

---

[1] One could say that in *every* workers' compensation case, the employer is immune from suit given that the "exclusivity" statutes, §§ 39-71-411 and -413, MCA, effectively make it impossible for the employee to ever sue the employer for injury in the workplace. *See Wise v. CNH Am., LLC*, 2006 MT 194, ¶¶ 14-18, 333 Mont. 181, 142 P.3d 774 (Nelson, J., concurring).

13

¶33   It makes obvious sense that the employer is required to cooperate with its WCA insurer to the limited extent of providing some basic background information regarding the injured worker and the claim.  However, whether we presume—or not—that the WCA insurer's approach will be to try to avoid entirely or to limit the payment of benefits to the injured worker, it is patently unfair for the WCA insurer to involve the employer in adjusting, mediating, and settling the injured worker's claim.

¶34   When that happens, the employer gets the best of both worlds.  Not only does the employer enjoy immunity from suit, the employer *also* gets to shoot down (or help shoot down) the injured worker's claim—thereby preserving its (the employer's) claims record for premium determination purposes, not to mention its WCA insurer's funds.

¶35   Concomitantly, the injured worker gets the worst of both worlds.  The injured worker cannot sue the employer[2] because of statutory exclusivity; and the injured worker cannot obtain the benefits, or the full measure of benefits, to which he or she may well be entitled due to the employer's poisoning the well.

¶36   The rule in *Hernandez v. Natl. Union Fire Ins. Co.*, 2003 MTWCC 5, ¶ 1, 2003 MT Wrk. Comp. LEXIS 4 (*see* Opinion, ¶ 13) is correct and ensures basic fairness and the viability of the quid pro quo.  The employer must not be involved in adjusting, mediating, or settling the injured worker's claim.  The employer must not be involved in the sorts of decisions that would militate in favor of the employer's being privy to materials, documents, and information protected by the attorney-client privilege between the employer's WCA insurer and its counsel.  In short, if the quid pro quo is to remain a viable concept, the employer cannot be part of the "magic circle," the "community of interest," or whatever one wants to call it.

¶37   I concur in the Court's well-reasoned Opinion.

/S/ JAMES C. NELSON

---

[2] Of course, as here, the injured worker *can* sue the employer's WCA insurer for bad faith and UTPA violations.

Justice Jim Rice, dissenting.

¶38 We recognized in *In re Rules* that "'information may be shared without loss of the privilege'" to parties who were outside the attorney-client relationship but nonetheless "within the 'magic circle' or community of interest" by virtue of shared legal interests. *In re Rules of Prof'l Conduct*, 2000 MT 110, ¶¶ 60, 70, 299 Mont. 321, 2 P.3d 806 (citation omitted). I believe the Court has understated the interests shared by American Zurich and Roscoe. I would hold that these parties have the necessary "community of interest" which permitted information to be shared in this matter without loss of the privilege. *In re Rules*, ¶ 70.

¶39 Although acknowledging that the parties share some general interests as employer and insurer, the Court concludes that Roscoe's role in the matter is "similar to that of a witness" in which Roscoe is "called upon to provide background information to Zurich about the employee's duties, history and facts about the injury." Opinion, ¶ 15. The Court's reasoning is premised upon the statutes which provide that the employer is not to be named as a party in an action for benefits, and that, under Plan II, the insurer is primarily liable to the employee. Opinion, ¶ 12. However, the fact that the employer is not the named party and the insurer holds exclusive authority to adjust a claim should not end the inquiry concerning their shared interests. As we explained in *In re Rules*, "'*the underlying concern is functional*: that the lawyer be able to consult with others needed in the representation and that the client be allowed to bring closely related persons who are appropriate, even if not vital, to a consultation.'" *In re Rules*, ¶ 60 (emphasis added) (quoting *U.S. v. Mass. Inst. of Tech.*, 129 F.3d 681, 684 (1st Cir. 1997)). After

15

considering the function of the relationship, I would conclude that Roscoe's role is significantly greater than that of a witness.

¶40     In *Householder v. Republic Indem. Co. of Cal.*, 2001 MTWCC 61, 2001 MT Wrk. Comp. LEXIS 82, the Workers' Compensation Court addressed a discovery dispute involving a claimant's attorney who contacted the employer directly to obtain information. While noting the distinctions between a workers' compensation case and other liability cases, the Workers' Compensation Court held that significant legal interests were nonetheless shared by the employer and the insurer. *Householder*, ¶ 9. Although employers are no longer named in workers' compensation cases, the Workers' Compensation Court's discussion of shared interests, even when the insurer is the liable party, is instructive:

> [W]hile a workers' compensation insurer is directly liable to the claimant, the employer's interests are affected . . . . At minimum, the employer is required to cooperate with the insurer in the litigation. The employer's interests will often dovetail with those of the insurer since its premiums may be affected by its loss experience.

*Householder*, ¶ 9. We noted this "dovetailing" of interests in the context of liability insurers at issue in *In re Rules* as well. *See In re Rules*, ¶ 37 (quoting Kent D. Syverud, *What Professional Responsibility Scholars Should Know About Insurance*, 4 Conn. Ins. L.J. 17, 23-24 (1997)) ("'[b]oth insurance companies and insureds have important and meaningful stakes in the outcome [of] a lawsuit against the insureds, stakes that include not just the money that the insurance company must pay in defense and settlement, but also the uninsured liabilities of the insured, which include not just any judgment in excess of liability limits, but also the insured's reputation and other non-economic stakes'").

¶41     An employer has no authority to influence the adjustment of a claim, *see Hernandez v. Nat'l Union Fire Ins. Co. of Pittsburgh*, 2003 MTWCC 5, ¶ 1, 2003 MT Wrk. Comp. LEXIS 4, but as recognized in *Householder*, the employer must still actively cooperate with the insurer in the defense of the claim. *Householder*, ¶ 9. The insurance contract between Zurich and Roscoe not only required Roscoe to provide Zurich with

documentation, the names and addresses of witnesses, and "other information [Zurich] may need," but also required Roscoe to "[c]ooperate with [Zurich] and assist [Zurich], as [Zurich] may request, *in the investigation, settlement or defense* of any claim, proceeding or suit." (Emphasis added.) This duty is consistent with the administrative rule imposing upon Roscoe a "duty to cooperate and assist" Zurich. Admin. R. M. 24.5.301(4). Thus, while Zurich held the ultimate authority for adjusting or defending the claim, Roscoe was nonetheless bound by rule and by contract to provide assistance to Zurich on the claim, from beginning to end, including the investigation phase, the settlement phase and, if necessary, the trial phase, in which it was obligated to assist Zurich in establishing a defense to the claim. This simply makes common sense, as an employer could possess a wealth of resources for the insurer, not the least of which may be expertise concerning the mechanism or causation of an accident, a potential liability issue. I thus disagree with the District Court's reasoning that Roscoe's "legal obligations in Peters' workers compensation case ceased after Zurich accepted liability over the claim."

¶42 Further, the employer will rightly be concerned about the future, particularly the potential for future liability exposure which may well be dependent upon the outcome of the claim. This concern is inherent within our legal system, which relies upon case precedent to establish liability in future cases. While this concern does not take away the ultimate responsibility for the claim from the insurer, it nonetheless is a legal concern also shared by the insurer, who must consider the precedent that may be created by way of a settlement or judgment, which in turn, may affect the viability of future claims and the underwriting which may be necessary for those claims. Even though the employer may exert no influence on the claim, the insurer's actions will potentially affect both the insurer and the employer, and that possibility will provide incentive for the employer to assist the insurer to the best of the employer's ability. The District Court reasoned that "Roscoe did not need to understand the legal analysis or legal implications of Peters' claim," but I disagree that such ignorance is or should be the order of the day.

17

¶43 Here, there were additional future liability concerns held by Zurich and Roscoe. During the pendency of his claim for workers' compensation benefits, Peters threatened to initiate further litigation against both Zurich and Roscoe on multiple occasions. In its discussion of factual background, Maynard's letter mentions this very possibility, stating that Peters "was clearly shopping his *Sherner* claim against Roscoe Steel."[1] Peters ultimately commenced this bad faith action against Zurich. Regardless of the ultimate litigation decisions Peters made, the fact remains that both Zurich and Roscoe were made aware of potential future litigation and both held an interest in resolving Peters' workers' compensation claim in a way which would not unnecessarily expose them to increased future liability. These interests are similar to those we identified in the liability context in *In re Rules* when we noted that "'the uninsured liabilities of the insured'" was a shared interest of the insurer and insured. *In re Rules*, ¶ 37 (citation omitted). We should encourage communication about such issues between the insurer and the employer—who may then encourage a prompt and fair settlement so that future bad faith litigation can be avoided—as incentive for good claim resolutions.

¶44 The Court states broadly that "it was not necessary or appropriate for Zurich to communicate its settlement strategy with Roscoe." Opinion, ¶ 16. However, while Roscoe had no authority to influence Zurich's litigation strategy, that should not bar Zurich from soliciting Roscoe's expertise in order to form the strategy. Indeed, it is by that very process of communication—the insurer discussing with the employer what options may be available to the insurer for adjusting or defending the claim, depending upon the information which is available—whereby the employer can be educated about the legal issues and better understand the nature of the information the insurer is seeking, so that it may fully satisfy its duties to support the insurer. It is unrealistic to think that communication between the insurer and employer can be reduced to a Webb-esque witness interview calling for "Just the facts, ma'am." As the Court notes, the purpose of

---

[1] The Maynard letter has been filed under seal, but will be disclosed as a result of the Court's decision.

18

the privilege is to promote such "full and frank communication." Opinion, ¶ 10. We should encourage such communication.

¶45 Nothing similar to these duties exists between the employer and the claimant. The Court notes that employers and employees also share common interests, and reasons that such interests align an employer with employees in a manner similar to the employer's alignment with the insurer. However, I believe this to be an unrealistic view of the litigation process, even within the workers' compensation context. While the employer and employee surely have numerous shared interests, the precise question here is the shared interests and the shared obligations of the employer and insurer in resolving the pending litigation.

¶46 For these reasons, I believe that, under Montana law, Roscoe shared a "community of interest" with Zurich in the resolution of this claim. *In re Rules*, ¶ 70. I would grant supervisory control and would reverse the District Court.


/S/ JIM RICE